DAVIS, Justice.
[¶1] In 1982, when Donald Clyde Davis was seventeen years old, he and a friend picked up a hitchhiker, robbed, and then murdered him. Mr. Davis pled guilty to first degree murder, felony murder, and aggravated robbery. He was sentenced to life imprisonment with a consecutive twenty-to-fifty-year sentence for aggravated robbery. Following the decisions of Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), Bear Cloud v. State , 2013 WY 18, 294 P.3d 36 (Wyo. 2013) ( Bear Cloud II ), and the Wyoming Legislature's amendment to Wyo. Stat. Ann. § 6-10-301(c), after serving over thirty-three years, Mr. Davis was granted parole from his life sentence, began serving his consecutive twenty-to-fifty-year sentence, and received a new individualized sentencing hearing. After the hearing, the district court declined to modify his original sentence. Mr. Davis appeals and raises a number of issues regarding his sentence. We will reverse and remand with instructions to conduct a new individualized sentencing hearing.
ISSUES
[¶2] We address the following issues:
1. Is Mr. Davis' aggregate sentence a de facto life without parole sentence in violation of the Eighth Amendment of the United States Constitution?
2. Would it be appropriate for this Court to accept the United States Supreme Court's invitation to handle the retroactive application of Miller by keeping in place Mr. Davis' sentence and deeming him eligible for parole?
3. Is Mr. Davis' aggregate sentence a de facto life without parole sentence in violation *672 of Article 1, § 14 of the Wyoming Constitution ?
4. What procedures are required for an individualized sentencing hearing under Miller and Montgomery ?
a. What presumptions, burdens and standards of proof should be applied at a Miller hearing?
b. Are specific findings required to support a Miller determination?
c. Is expert evidence required to support a Miller determination?
d. What evidence may the sentencing court consider in making retroactive Miller determinations?
e. What standard of review should this Court apply to its review of a Miller determination?
5. Did the district court abuse its discretion when it conducted the individualized sentencing hearing and sentenced Mr. Davis to his original sentence?
FACTUAL BACKGROUND AND PROCEEDINGS
The Offenses
[¶3] In February of 1983, Mr. Davis pled guilty to one count of first degree murder, one count of felony murder, and one count of aggravated robbery, crimes he committed when he was seventeen years old. The Presentence Investigation Report (PSI) described the events. According to Mr. Davis, he had consumed Yukon Jack and "eight or nine beers" with a friend when he met up with Robert Cotton at approximately 4:00 p.m. on September 5, 1982. They stopped at a liquor store, where they purchased a six-pack of beer and a bottle of MD 20-20. Mr. Davis drank "two or three beers and some of the MD 20-20" (a high alcohol content wine). He and Mr. Cotton then picked up a hitchhiker between Gillette and Buffalo, intending to rob him. Mr. Davis explained, "We couldn't think of how to go about this, so I told him not to worry about it, I'll think of something."
[¶4] Mr. Cotton stopped the car, pretending he had to urinate. Mr. Davis and Mr. Cotton exited the vehicle to discuss how they were going to get the victim out of the car. Mr. Cotton "pulled him out of the car" and "threw him down on the ground," and said, "If you try to fight, I will break your neck." Mr. Cotton ordered Mr. Davis to retrieve a set of handcuffs from the vehicle and asked Mr. Davis for his knife, which Davis gave to him. Mr. Davis got the cuffs, and Mr. Cotton handed him his knife and handcuffed the victim. Mr. Davis stated that he was going to put the knife away then, but "didn't for some reason."
[¶5] Mr. Cotton went through the victim's pockets, retrieving "a bunch of things," including money and a lighter. They decided to uncuff the victim and send him down the road on foot. However, as Mr. Cotton went to uncuff him, he had one hand behind the victim's head, pulling his hair, while Mr. Davis held the knife "over his neck." The victim "raised up and the knife stuck in his throat." Mr. Davis explained that "the guy was screaming and bleeding pretty good. Mr. Cotton suggested, 'Finish him off because he is going to die anyway. Just put him out of his misery.' " Mr. Davis then "knelt down, pushed the knife in as far as [he] could and slit his throat ... in only one motion."[1] Mr. *673 Davis got into the car, and Mr. Cotton followed a little later, with "blood all over his arms and hands." Mr. Davis stated that "[i]f I hadn't been drinking, it never would have happened."
The Original Sentencing and the Presentence Investigation Report
[¶6] Mr. Davis was originally sentenced on February 22, 1983. The court did not receive testimony before sentencing Mr. Davis, but the PSI was filed in the court on the day he was sentenced. The PSI provided some history of Mr. Davis' life before prison.
[¶7] Mr. Davis' father drowned at the age of nineteen, when Mr. Davis was an infant. When he was two, his mother married Richard Johnson, his primary father figure. Mr. Davis' mother and his stepfather had two additional sons, one born when he was four years old and the other when he was nine. Mr. Johnson was an alcoholic. Mr. Davis' mother and Mr. Johnson divorced in 1978, but reunited shortly thereafter and maintained a relationship characterized as "unstable, primarily due to Mr. Johnson's past alcohol abuse."
[¶8] Mr. Davis had a juvenile record that consisted of several non-violent charges, including burglary/petty theft in 1980, shortly after his family relocated from Michigan to Arizona, possession of a stolen vehicle when he was fourteen, and resisting arrest in 1981. In 1980, after the burglary/petty theft, he was placed at the Adobe Mountain School and underwent psychological and educational evaluation. He participated in a treatment program designed "to meet his needs for individual and group therapy." There he had "trouble relating effectively with both peers and staff and it was felt this stemmed from an extremely poor self concept." He attempted suicide several times. By the summer and fall of 1980, "his behavior and attitudes showed improvement" and he was released to the custody of his parents.
[¶9] Approximately three months later, Mr. Johnson reported to correctional authorities that Mr. Davis had been suspended from school for fighting and that he was in possession of marijuana. Mr. Davis was apprehended, charged with resisting arrest, and sent to the Catalina Mountain School. He remained there for four months until he was "given a full discharge." While he was incarcerated, his family returned to Michigan; and upon his discharge Mr. Davis joined them. The family moved to Gillette, Wyoming in 1982 for a brief period, and then returned to Michigan. Mr. Davis joined them in Michigan for a short time before returning to Gillette.
[¶10] Prior to the events that resulted in the charges in this case, Mr. Davis had several psychological examinations: one in 1975 conducted by the Diagnostic Center, one in 1979, one conducted in Michigan in 1980, and one conducted at the Adobe Mountain School in 1980. None of the reports from these examinations are contained in the record, but the PSI quotes from them. The 1975 Diagnostic Center report "noted that '[Mr. Davis] sometimes would fly into a rage and do destructive things without any apparent trigger, and that he frequently left home for several hours at a time, always returning at night.' " The 1979 examination, which was referred to in the 1980 Michigan report, found Mr. Davis "to be a 'very angry boy who is attempting to get even with his parents.' " The 1980 Michigan report referred to the 1975 Diagnostic Center report and described Mr. Davis as "a disturbing element in the classroom from the first grade through the fifth grade."
[¶11] The 1980 Adobe Mountain School evaluation "depicted [Mr. Davis] as seeing himself as 'a total failure in life and that he was such a miserable person, that he and everyone else in the world necessarily should dump on him because of his badness.' " The Adobe Mountain School evaluator felt that "some of [Mr. Davis'] behavioral and academic problems might be neurological in nature" and that "additional sources of stress appear to include 'his highly ambivalent *674 home situation.' " That evaluator also indicated that Mr. Davis was
highly emotionally constricted and confused in terms of how to work his way out of his current problems. The belief of [Mr. Davis] that he is a bad person and must act out that way, or if he wishes to follow what appears to be at least some well-defined positive instincts and engage in desirable behavior, creates a great deal of tension in [him]. Thus, he is very easily triggered-off to engage in very impulsive acts.
[¶12] The PSI summarized Mr. Davis' educational background: he completed eleventh grade, and attended public schools where he had "most of his difficulties" and consequently spent "considerable time in special educational classes." His public school teachers observed problems such as truancy, acting out, moodiness, and a lack of motivation. However, Mr. Davis "seemed to function better and maintain a more positive attitude toward his education while receiving institutional care in Arizona."
[¶13] Mr. Davis' employment history included five food service jobs which he had off and on between December of 1980 and August of 1982. None of those jobs lasted more than three months.
[¶14] Without hearing testimony or referring to the PSI, the court sentenced Mr. Davis to life plus twenty to fifty years, consecutively, in accordance with plea negotiations that had taken place.
Resentencing
[¶15] On June 25, 2013, after decisions by the United States Supreme Court in Miller v. Alabama , 567 U.S. 460, 470-71, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407 (2012), and this Court in Bear Cloud v. State , 2013 WY 18, ¶ 34, 294 P.3d 36, 45 (Wyo. 2013) ( Bear Cloud II ), Mr. Davis filed a motion to correct an illegal sentence. He requested that the court vacate his original sentence and conduct a new sentencing hearing consistent with the mandate of Miller v. Alabama . By operation of Wyo. Stat. Ann. § 6-10-301(c), Mr. Davis's life sentence was converted to life with the possibility of parole after twenty-five years and, on December 15, 2015, Mr. Davis was paroled from his life sentence to begin serving time on his twenty-to-fifty-year sentence for aggravated robbery.
[¶16] Mr. Davis subsequently supplemented his original motion to correct an illegal sentence, arguing that his new aggregate sentence (life lasting a minimum of twenty-five years plus consecutive twenty to fifty years) remains a de facto life sentence with no meaningful chance of release during his lifetime. He sought vacation of his sentence and a new sentencing hearing consistent with Miller and Bear Cloud v. State , 2014 WY 113, ¶ 33, 334 P.3d 132, 141-42 (Wyo. 2014) ( Bear Cloud III ). The State agreed that Mr. Davis was entitled to an individualized sentencing hearing. The district court held a sentencing hearing in July of 2016 and imposed the original sentence.
[¶17] Mr. Davis' mother testified at the hearing. She stated that as a child Mr. Davis was "easy going, fun loving, caring" until he began to use drugs and alcohol as a teen. She also explained that he always had a "good relationship" with her and that his relationship was "good" with her husband when her husband wasn't drinking. She described her current relationship with Mr. Davis as "great" and described him as "back to the little boy I once knew. He's caring. He's outgoing. And I don't see anger anymore."
[¶18] Mr. Davis testified on his own behalf. He testified regarding his behavior as a child. He explained that he was angry because of the way his stepfather treated him:
[A] lot of times he told me I was worthless and would never amount to anything.
That started when I was probably 11.
And I become, to start to believe it. And nothing really mattered to me.
His stepfather was violent when he was drinking-he verbally abused Mr. Davis and would beat him until he passed out.
[¶19] Mr. Davis also testified regarding his incarceration. He described the programs he completed:
I've completed a lot of the anger management, Thinking for a Change, the drug and alcohol programs, vocational programs, carpentry, electronics, drafting.
*675 ....
I think the journaling classes that I took is the ones I think I've gotten the most out of. And it's helped me come up with different ways to think through problems before I react.
Twenty-eight pages of certificates from courses Mr. Davis completed over the years were provided to the court. He stated that he no longer feels angry and when asked what changed, he responded:
I grew up was the biggest part.
....
I grew up, matured.
I was very immature, you know, uneven at 17. You know, even when after I went to prison 18, 19 I was still-I look back I was pretty immature even then.
....
And then I grew up.
Mr. Davis currently resides in K unit, the working pod at the penitentiary. At the time of the hearing, he had lived there for three years. To qualify for K unit, an inmate must have at least six months with no write-ups and remain write-up free. It had been over four years since Mr. Davis had a write-up at the time of the hearing. Mr. Davis testified that he got along well with his coworkers and his supervisor.
[¶20] The State presented Mr. Davis' prison disciplinary records. During thirty-four years in prison, Mr. Davis received seventeen write-ups, never had a violent altercation, and was never charged with any crimes. Several of his write-ups, however, reveal threats made to prison staff and one reveals consumption of marijuana while incarcerated. He has not received a write-up since 2012.
[¶21] After the hearing, the sentencing court issued a written ruling:
In order to properly apply the [ Miller / Bear Cloud ] factors, as outlined by the Wyoming Supreme Court, this Court carefully reviewed the pleadings, record, and considered the testimony from the Defendant and witness.
The Court notes that several of the [ Miller / Bear Cloud ] factors intermingle, and they will therefore not be addressed separately, but rather as a narrative. First, the Court notes that in reading the original Pre-Sentence Investigation (PSI), it appears that Defendant was not a stranger to the criminal justice system, but had rather been, if not a frequent, but at least [a] persistent participant from the time he was twelve (12) years old, until he was around sixteen (16) years old. It appears that most of his juvenile infractions were property related-possession of a stolen vehicle and a couple of burglaries. It appears that the Defendant was in juvenile detention for extended periods and that at least two (2) psychological evaluations were completed, both of which concluded that Defendant was uncontrollably aggressive and could fly into a rage from unpredictable triggers. Taking the circumstances of the subject offense into consideration-the victim was handcuffed and his throat slit from one side to the other-Defendant's history of aggressive behavior is troubling. Defendant further conspired with his co-defendant in planning and executing the robbery-turned-homicide, and, there is nothing in either Defendant's original statement, nor his testimony to this Court, which suggests that he was pressured into committing the crime by someone else. Rather, it is well documented, and Defendant said as much when testifying, that when he and his co-defendant first started contemplating the crime, Defendant told his codefendant "not to worry about it, I'll think of something."
The Court further notes that at the time of the offense, Defendant was living independently from his family in Gillette, Wyoming, while his family lived in Michigan. He was also employed at a restaurant up until just a few days before the murder occurred, and it seems that he had maintained employment in various restaurants for approximately two (2) years prior to the events. In light of that, the Court finds that in spite of his youth, Defendant was in essence emancipated, and participating in society as an adult.
The Court must also consider the potential of rehabilitation-in this case, it appears that even though the Defendant has been presented with, and completed, a vast *676 range of programs aimed at assisting incarcerated persons personal growth, Defendant still seems to maintain a violent and aggressive attitude based on statements he has made, and incidents he has been involved in, as described above. This also seems consistent with the reports from Defendant's youth as described in the PSI, wherefore the Court finds that rehabilitation is unlikely at this stage in Defendant's life.
... Defendant was literally days away from his eighteenth (18th) birthday at the time of the crimes.
[¶22] The district court concluded that the "Defendant in this matter is one of those rare cases where the sentence previously imposed was appropriate and the Court therefore declines to modify it." Implicit in this statement is the conclusion that Mr. Davis is unredeemable, and thus the aggregate sentence of life without the possibility of parole was appropriate. Mr. Davis appealed, raising numerous issues. After briefing and argument, this Court ordered supplemental briefing on numerous issues that had not been addressed by the parties.
DISCUSSION
1. Is Mr. Davis' aggregate sentence a de facto life without parole sentence in violation of the Eighth Amendment of the United States Constitution?
[¶23] Mr. Davis argues that his sentence categorically violates the United States Constitution. Generally, we review a constitutional challenge to a sentence de novo. See Bear Cloud v. State , 2013 WY 18, ¶ 13, 294 P.3d 36, 40 (Wyo. 2013) ( Bear Cloud II ); Bear Cloud v. State , 2014 WY 113, ¶ 13, 334 P.3d 132, 137 (Wyo. 2014) ( Bear Cloud III ).
[¶24] Mr. Davis had served almost thirty-four years on his life sentence when he was paroled in December of 2015; he is now serving his consecutive twenty-to-fifty-year sentence for aggravated robbery. If he serves the shortest possible sentence for aggravated robbery, he will have served almost fifty-four years in prison and will be released when he is seventy-one years old. At Mr. Davis' earliest projected parole eligibility date, he will have served forty-six years and will be sixty-four years old. Mr. Davis argues that even if he had originally been sentenced to serve twenty-five years to life on the murder charge, his aggregate sentence would be a minimum of forty-five years. He contends, therefore, that his sentence amounts to a de facto life sentence without parole according to our holding in Bear Cloud III , and that it is consequently prohibited by the Eighth Amendment's constraint against cruel and unusual punishment.
[¶25] In Bear Cloud III , we considered the question of whether Mr. Bear Cloud's aggregate sentence violated the Eighth Amendment. The district court sentenced Mr. Bear Cloud to life in prison with the possibility of parole after twenty-five years for felony murder, to run consecutively with a twenty-to-twenty-five-year sentence for aggravated burglary, and concurrently to a sentence for conspiracy to commit aggravated burglary. Id . ¶ 11, 334 P.3d at 136. Under this sentencing structure, Mr. Bear Cloud's earliest opportunity for release would have been after serving just over forty-five years, when he was sixty-one years old. Id . We held that the aggregate sentences of forty-five years resulted in "the functional equivalent of life without parole" and that "the teachings of the Roper / Graham / Miller trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability and greater prospects for reform' " when aggregate sentences are the functional equivalent of life without parole.[2] Id. ¶ 33, 334 P.3d at 141-42.
[¶26] Bear Cloud III requires us to conclude that Mr. Davis' aggregate sentence is "the functional equivalent of life without parole." However, we cannot agree with Mr. Davis' assertion that that fact alone makes his sentence unconstitutional. In Bear Cloud III , after concluding that Mr. Bear Cloud's sentence was the functional equivalent of life without parole, we remanded for an individualized *677 sentencing hearing because the sentencing court had not considered Mr. Bear Cloud's entire sentencing package in a hearing pursuant to Miller . Bear Cloud III , ¶ 36, 334 P.3d at 143. We instructed sentencing courts that before they may impose sentences that will be the functional equivalent of life without parole, they must conduct a Miller hearing and "consider the practical result of lengthy consecutive sentences, in light of the mitigating factors of youth" set forth in Miller and Bear Cloud II . Id. We cautioned that occasions for sentencing juveniles to harsh sentences, including sentences that act as the functional equivalent of life without parole, will be "uncommon." Id. ¶ 37, 334 P.3d at 144.
[¶27] Here, the district court conducted an individualized sentencing hearing before resentencing Mr. Davis. The fact that the sentence is the functional equivalent of life without parole does not make it unconstitutional.[3]
2. Would it be appropriate for this Court to accept the United States Supreme Court's invitation to handle the retroactive application of Miller by keeping in place the offender's sentence and deeming him eligible for parole?
[¶28] In Montgomery , the Supreme Court commented with respect to the retroactive effect of Miller :
Giving Miller retroactive effect, moreover, does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. See, e.g., Wyo. Stat. Ann. § 6-10-301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years). Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity-and who have since matured-will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.
Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 736, 193 L.Ed.2d 599 (2016).
[¶29] In our order requesting supplemental briefing, we asked the parties to address whether it would be appropriate to accept the Supreme Court's above-quoted solution. The resulting order would keep Mr. Davis' original sentence in place but make him immediately eligible for parole.
[¶30] Both parties argue against the Supreme Court's proposed solution. The State contends that this Court lacks the statutory authority to make Mr. Davis immediately parole eligible, while Mr. Davis contends that doing so would not correct the alleged constitutional defect in his sentence. Because neither party advocates for the Supreme Court's proposed solution, we have no need to consider the question further and decline to do so at this time.[4]
3. Is the aggregate sentence a de facto life without parole sentence in violation of Article 1, § 14 of the Wyoming Constitution ?
[¶31] Mr. Davis also argues that Article 1, § 14 of the Wyoming Constitution categorically *678 bars de facto life sentences without the possibility of parole for juvenile offenders. The State counters that this argument is barred by the doctrine of res judicata, and in the alternative, that Mr. Davis waived the argument because he failed to present it to the district court during resentencing, and that the Wyoming Constitution provides no further protections than the United States Constitution.
[¶32] We address the State's waiver argument because that is dispositive here.
Our precedent is clear that an argument may not be made for the first time on appeal. Miller v. Beyer , 2014 WY 84, ¶ 34, 329 P.3d 956, 967 (Wyo. 2014) ("This Court has repeatedly stated that it will not consider arguments made for the first time on appeal."). This rule holds true "whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court." Crofts v. State ex rel. Dep't of Game and Fish , 2016 WY 4, ¶ 19, 367 P.3d 619, 624 (Wyo. 2016) (quoting Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp. , 2015 WY 22, ¶ 28, 343 P.3d 783, 791 (Wyo. 2015) ); see also Acorn v. Moncecchi , 2016 WY 124, ¶ 61, 386 P.3d 739, [758] n.13 (Wyo. 2016) ("As we have stated on numerous occasions, we will not consider evidence that is not part of the record on appeal or arguments that were not presented to the trial court.").
Gumpel v. Copperleaf Homeowners Association, Inc ., 2017 WY 46, ¶ 32 n.7, 393 P.3d 1279, 1291 n.7 (Wyo. 2017) ; see also Black v. State , 2017 WY 135, ¶ 15, 405 P.3d 1045, 1051 (Wyo. 2017). "Parties are bound by the theories they advanced below." Davis v. City of Cheyenne , 2004 WY 43, ¶ 26, 88 P.3d 481, 490 (Wyo. 2004). "We recognize only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered." Id .
[¶33] The record reveals that Mr. Davis did not argue that the Wyoming Constitution categorically bars a de facto life sentence in his motion to correct an illegal sentence or at the resentencing hearing. In his June 2013 motion to correct an illegal sentence he argued that if the court determined that Miller was not retroactive, it should still conduct a new sentencing hearing based upon Article 1, § 14 of the Wyoming Constitution. The record does not indicate, however, that Mr. Davis claimed that a de facto life sentence is unconstitutional under the Wyoming Constitution-the limited reference to the Wyoming Constitution in the context of retroactivity was insufficient. During his resentencing hearing, Mr. Davis' attorney argued that resentencing should be governed by Miller and the Bear Cloud cases, but did not claim that the Wyoming Constitution categorically barred life, or de facto life, sentences. Accordingly, we can only conclude that Mr. Davis did not sufficiently raise the issue below. See Poitra v. State , 2016 WY 20, ¶¶ 18-19, 368 P.3d 284, 288-89 (Wyo. 2016). Further, the issue does not present a jurisdictional question.
[¶34] Thus, the question that remains is whether the question is of such a fundamental nature that it must now be considered. Black , ¶ 15, 405 P.3d at 1051. The assertion of a "fundamental right" or a constitutional issue "does not necessarily persuade this Court to consider the issue for the first time on appeal." Crofts v. State ex rel. Dept. of Game & Fish , 2016 WY 4, ¶ 24, 367 P.3d 619, 625 (Wyo. 2016). We have held that other constitutional issues are not of such a fundamental nature that they must be considered. For example, in Davis , we refused to consider the appellant's argument that his First Amendment right to free speech had been violated because he had not raised the issue below. Davis , ¶ 27, 88 P.3d at 490. In Poitra we refused to consider the appellant's claim that his sentence violated the Eighth Amendment because it had not been raised below. Poitra , ¶¶ 18-19, 368 P.3d at 288-89. See also Crofts , ¶¶ 26-32, 367 P.3d at 626-27. We have "declined to address newly raised issues that present constitutional questions where nothing more is shown to compel the Court's review," and we have held that a new issue may not be considered on appeal even when it is "of a fundamental nature, because the issue was 'not properly developed for review.' " Crofts , ¶ 24, 367 P.3d at 625 (citing Utley v. Lankford, 2013 WY 65, ¶ 29, 301 P.3d 1092, 1101 (Wyo. 2013) ;
*679 Greenwood v. FAA, 28 F.3d 971, 978 (9th Cir. 1994) ). We are not convinced that the question of whether a de facto life sentence is categorically barred by the Wyoming Constitution must be reviewed at this time and without the development of the issue at the district court. Accordingly, we will not address it for the first time on appeal.
4. What procedures are required for an individualized sentencing hearing under Miller and Montgomery ?
[¶35] We recognize that the task of determining whether a juvenile is permanently incorrigible is difficult, if not impossible. The Roper Court remarked, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Roper , 543 U.S. at 573, 125 S.Ct. at 1197 (citing Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty , 58 Am. Psychologist 1009, 1014-16 (2003) ). "If this determination is difficult for even trained psychologists, we would be remiss if we did not acknowledge our concerns about sentencing courts-or reviewing courts for that matter-accurately assessing, or in essence forecasting, whether an individual who committed a crime while still a minor is and will remain irreparably corrupt for the rest of his or her life and on the basis of that assessment accurately meting out a proportionate sentence." People v. Hyatt , 316 Mich.App. 368, 891 N.W.2d 549, 573-74 (2016), appeal denied , People v. Williams , 500 Mich. 921, 888 N.W.2d 64 (2016).
[¶36] Nevertheless, Roper, Graham, and Miller emphasized that "children are different." Miller , 567 U.S. at 478-80, 132 S.Ct. at 2469. The Supreme Court recognized three general differences between juveniles and adults. First, juveniles are more likely to possess an "underdeveloped sense of responsibility" and to engage in reckless behavior. Roper , 543 U.S. at 569, 125 S.Ct. at 1195 (citation and quotation marks omitted). Second, they are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Id . Third, they "are more capable of change than are adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults." Graham , 560 U.S. at 68, 130 S.Ct. at 2026 (citation and quotation marks omitted). Consequently, "youth is more than a chronological fact" and "its signature qualities are all transient." Miller , 567 U.S. at 476, 132 S.Ct. at 2467 (citations and quotation marks omitted). The Miller Court reasoned that these attributes "diminish the penological justifications for imposing the harshest sentence on juvenile offenders, even when they commit terrible crimes." Miller , 567 U.S. at 472, 132 S.Ct. at 2465.
[¶37] Thus, although Miller did not categorically bar discretionary life sentences or de facto life sentences against juvenile offenders, it made clear "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." Miller , 567 U.S. at 474, 132 S.Ct. at 2466. Miller required that sentencing courts "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller , 567 U.S. at 480, 132 S.Ct. at 2469. Finally, Miller listed factors for sentencing courts to consider when examining the "mitigating qualities of youth." Miller , 567 U.S. at 476, 132 S.Ct. at 2467. In Bear Cloud II , we directed that when performing an individualized sentencing hearing for juveniles, sentencing courts must consider the non-exhaustive list of factors identified in Miller . Bear Cloud II, ¶¶ 42, 44, 294 P.3d at 47. In Bear Cloud III , we extended the requirement for individualized juvenile sentencing hearings to courts that impose lengthy aggregate sentences, concluding that before sentencing a juvenile to a sentence that is the functional equivalent of life without parole, the Constitution entitles the juvenile to an individualized sentencing hearing in which the court must determine whether the juvenile is "irredeemable." Bear Cloud III , ¶ 37, 334 P.3d at 144.
[¶38] After Miller , "state courts were left to determine if the ruling applied retroactively to the over 2000 incarcerated persons *680 serving mandatory life without parole sentences for crimes committed as juveniles. State supreme courts split." Alice Reichman Hoesterey, Confusion in Montgomery's Wake: State Responses, the Mandates of Montgomery, and Why a Complete Categorical Ban on Life Without Parole for Juveniles is the Only Constitutional Option , 45 Fordham Urb. L.J. 149, 151 (2017). The Supreme Court addressed the question in Montgomery v. Louisiana and concluded that Miller applied retroactively. Montgomery , 136 S.Ct. at 734. The Supreme Court made clear that a sentencing court must determine that a juvenile is irreparably corrupt or permanently incorrigible prior to imposing a sentence of life without parole: "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.' " Id . (quoting Miller , 567 U.S. at 479-80, 132 S.Ct. at 2469 (quoting Roper , 543 U.S. at 573, 125 S.Ct. at 1197 ) ).
[¶39] Miller and Montgomery provide little guidance to state courts that are charged with conducting individual sentencing hearings, applying the Miller factors, and ultimately determining whether a juvenile is permanently incorrigible. Miller set forth no detail regarding the procedure required for a sentencing court's analysis of "youth and attendant characteristics before determining that life without parole is a proportionate sentence." Montgomery , 136 S.Ct. at 734 ; Miller , 567 U.S. at 476, 132 S.Ct. at 2467. Montgomery expressly left it up to the states to develop procedures for enforcing Miller's substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole. Id. at 735 ; see Commonwealth v. Batts , 163 A.3d 410, 452 (Pa. 2017) ; Hyatt , 891 N.W.2d at 556 ; People v. Holman , 418 Ill.Dec. 889, 91 N.E.3d 849, 862 (Ill. 2017) (remarking that courts struggle with how to apply Miller ).
[¶40] Due to the lack of guidance and the express direction from the Supreme Court that states must develop their own procedures for sentencing juvenile offenders to lengthy sentences, we requested supplemental briefing from the parties regarding the procedure that ought to be followed in individualized sentencing hearings in Wyoming. Specifically, we asked the parties to address the burdens that ought to apply in a Miller hearing, the evidence that may be considered in making a retroactive Miller determination, whether a determination that a juvenile is irreparably corrupt may be made without expert testimony, and the standard of review that should be applied when we review sentencing courts' Miller findings.
A. What presumptions, burdens and standards of proof should be applied at a Miller hearing?
[¶41] There is no consensus regarding whether the State or a juvenile defendant should bear the burden of proving or disproving that the juvenile is irreparably corrupt or the burden of proof applicable to that determination. Some states have placed the burden on the State. In State v. Hart , 404 S.W.3d 232 (Mo. 2013), the Missouri Supreme Court held that "[u]ntil further guidance is received, a juvenile offender cannot be sentenced to life without parole ... unless the state persuades the sentencer beyond a reasonable doubt that this sentence is just and appropriate under all the circumstances." Id. at 241. Similarly, in Commonwealth v. Batts , the Pennsylvania Supreme Court found that Miller and Montgomery created a presumption against life without parole for juvenile offenders and placed the burden of overcoming that presumption on the government with proof beyond a reasonable doubt. Batts , 163 A.3d at 452-55. Other states have placed the burden on the offender. The Arizona Supreme Court announced, without providing rationale for its conclusion, that at a Miller hearing the defendant has "an opportunity to establish, by a preponderance of the evidence, that [his] crimes did not reflect irreparable corruption but instead transient immaturity." State v. Valencia , 241 Ariz. 206, 386 P.3d 392, 396 (2016). The Supreme Court of Washington recently concluded that Miller does not prohibit placing the burden on juvenile offenders "to prove an exceptional sentence [below the standard range including life without parole or its functional equivalent] is justified." State v. Ramos , 187 Wash.2d 420, 387 P.3d 650, 659 (2017) ; see *681 also Jones v. Commonwealth , 293 Va. 29, 795 S.E.2d 705, 726 (2017) (Powell, J., dissenting).
[¶42] Given this lack of consensus, the State urges us to apply our current sentencing standards to Miller hearings, with neither party bearing the burden of proof and requiring only that the sentencing court "consider [ ] all of the available, relevant evidence ... and mak[e] a reasonable choice." See Noel v. State , 2014 WY 30, ¶ 42, 319 P.3d 134, 147-48 (Wyo. 2014). Mr. Davis urges us to adopt the burdens and procedures established by the legislature for the imposition of the death penalty. See Wyo. Stat. Ann. § 6-2-102 (LexisNexis 2017).
[¶43] The Miller Court explained that "given all we have said in Roper , Graham , and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." Miller , 567 U.S. at 479, 132 S.Ct. at 2469. The Montgomery Court echoed this caution, stating that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, whose crimes reflect irreparable corruption." Montgomery , 136 S.Ct. at 726 (citation and quotation marks omitted). We cannot disregard this direction, and we "cannot proceed as though [juvenile offenders] are not children." Miller , 567 U.S. at 474, 132 S.Ct. at 2466. Therefore, we cannot agree with the State's argument that there is no presumption or burden to prove anything at a Miller sentencing hearing. However, absent legislative direction, we are unwilling to establish a detailed procedure identical to the statutes pertaining to the death penalty, as Mr. Davis has requested.
[¶44] A sentencing court must begin its analysis with the premise that in all but the rarest of circumstances, a life-without-parole (or the functional equivalent thereof) sentence will most likely be disproportionate for the juvenile before it. See Hyatt , 891 N.W.2d at 574 ("A sentencing court must operate under the understanding that life without parole is, more often than not, not just inappropriate, but a violation of the juvenile's constitutional rights."); Hoesterey, supra , 45 Fordham Urb. L. J. at 164-65 (after Miller at least "five state supreme courts [have] held that Miller dictates a presumption against juvenile life without parole"). Following Montgomery , the Pennsylvania Supreme Court held that because life without the possibility of parole will be a rare sentence for juvenile offenders, there is a presumption against that sentence, and the State may rebut that presumption "upon proof that the juvenile is removed from [the] generally recognized class of potentially rehabitable offenders." Batts , 163 A.3d at 452. This conclusion rests upon "generally known results of wide human experience" that "the vast majority of adolescents change as they age," and we presume that juvenile offenders are part of that majority. Id . (citations and internal quotation marks omitted).
[¶45] A faithful application of Miller and Montgomery requires Wyoming to join Pennsylvania and the other states that have concluded there must be a presumption against imposing a life sentence without parole, or its functional equivalent, on a juvenile offender. See, e.g., State v. Riley , 315 Conn. 637, 110 A.3d 1205, 1214 (2015) ; State v. Houston , 353 P.3d 55, 77, 83 (Utah 2015) ; State v. Seats , 865 N.W.2d 545, 555 (Iowa 2015) ; Hart , 404 S.W.3d at 241 ; Conley v. State , 972 N.E.2d 864, 871 (Ind. 2012) (requiring State to prove aggravating circumstances justifying life without the possibility of parole beyond a reasonable doubt). Further, we conclude, as did Pennsylvania and Missouri, that the State bears the burden of overcoming that presumption at sentencing. Indeed, "any suggestion of placing the burden on the juvenile offender is belied by the central premise of Roper, Graham, Miller and Montgomery -that as a matter of law, juveniles are categorically less culpable than adults." Batts , 163 A.3d at 452.
[¶46] The next question that arises is what standard of proof is required to meet this burden. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual *682 conclusions for a particular type of adjudication." Cooper v. Oklahoma , 517 U.S. 348, 362, 116 S.Ct. 1373, 1381, 134 L.Ed.2d 498 (1996) (internal citation and quotation marks omitted).
[¶47] Wyoming courts apply three standards of proof: preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt. "A 'preponderance of the evidence' is defined as proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." J.J.F. v. State , 2006 WY 41, ¶ 9, 132 P.3d 170, 174 (Wyo. 2006) (internal citations and quotation marks omitted). "Clear and convincing evidence," on the other hand, is defined as "that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." Id. ¶ 9, 132 P.3d at 174 (internal citations and quotation marks omitted). Finally, proof beyond a reasonable doubt is required to prove guilt in criminal cases and is the most stringent standard that carries with it the highest evidentiary burden. Watts v. State , 2016 WY 40, ¶ 14, 370 P.3d 104, 108-09 (Wyo. 2016) ; Corson v. State , 766 P.2d 1155, 1162 (Wyo. 1988). Application of these standards varies largely with the nature of the case and the issues therein. Proof by a preponderance of the evidence and clear and convincing evidence apply in civil matters. Proof beyond a reasonable doubt is the standard generally applied in criminal cases.
[¶48] To determine which standard of proof is required to satisfy due process, we employ the four-part balancing test identified in Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976), and we weigh (1) the private interest affected by the official action; (2) the risk of the erroneous deprivation of such interest through the procedures used; (3) the probable value of any alternative procedures; and (4) the government's interest. J.J.F. , ¶ 10, 132 P.3d at 174.
[¶49] The private interest at issue in a Miller individualized sentencing hearing is a juvenile's loss of liberty and the ability to demonstrate a capacity to mature and be rehabilitated over time. "The risk of an erroneous decision against the [juvenile] would result in the irrevocable loss of that liberty for the rest of his [ ] life." Batts , 163 A.3d at 454. Miller recognized that life without parole is a proportionately harsher sentence for juveniles than for adults because juveniles will spend a larger percentage of their life behind bars. Miller, 567 U.S. at 475, 132 S.Ct. at 2466. In contrast, minimal risk is associated with an erroneous decision in favor of the juvenile: sentencing the juvenile to a term of years with the possibility of parole when that juvenile is one of the rare individuals incapable of rehabilitation would simply mean that, while eligible for parole, the unrehabilitated juvenile would likely never obtain release on parole and would spend the rest of his life in prison. The State has an interest in "ensuring criminals are punished for their actions and that society is protected from further harm committed by them, [and] this interest remains protected by a life-with-parole sentence because there are no guarantees that parole will ever be granted." Batts , 163 A.3d at 454.
[¶50] As the Batts court recognized,
To protect youthful offenders from erroneous decisions that foreclose their ability to ever be released from prison, the Supreme Court therefore held that a sentence of life without parole is disproportionate and illegal for a juvenile offender unless that defendant "exhibits such irretrievable depravity that rehabilitation is impossible ." Montgomery, 136 S.Ct. at 733 (citing Miller , 567 U.S. at 479-80, 132 S.Ct. 2455 )[.]
Batts , 163 A.3d at 455 (emphasis in original). In accordance with our weighing of the interests at stake and the Supreme Court's language in Miller we conclude that the appropriate standard of proof in this instance is proof beyond a reasonable doubt. The State can overcome the presumption against the imposition of a life-without-parole sentence (or the functional equivalent of such a sentence) with proof beyond a reasonable doubt that the juvenile offender is irreparably corrupt, in other words, beyond the possibility of rehabilitation. To satisfy this burden, the State must address the factors set forth in Miller and Bear Cloud II .
*683 B. Are specific findings required to support a Miller determination?
[¶51] We asked the parties to address the question of whether specific findings must be made to support a Miller determination. Mr. Davis contends that in "order to give effect to Miller 's substantive meaning, ... sentencing courts must make specific findings under each Miller / Bear Cloud II factor, ... including a finding of irreparable corruption when imposing a LWOP sentence on a child." The State, on the other hand, argues that Montgomery does not require specific findings to support a Miller determination.
[¶52] It is true that the Montgomery Court stated that " Miller did not impose a formal factfinding requirement." Montgomery , 136 S.Ct. at 735. However, as explained above, the Montgomery Court left it up to the states to develop procedures for enforcing Miller's substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole. Id . The Montgomery Court was "careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." Id . Montgomery , however, emphasized that States are not "free to sentence a child whose crime reflects transient immaturity to life without parole" because such a sentence "is disproportionate under the Eighth Amendment." Id .
[¶53] This constitutional standard cannot be satisfied unless the sentencing court determines that, in light of all the Miller factors, the juvenile offender's crime reflects irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. See, e.g., Batts , 163 A.3d at 459-60 ; State v. Simmonds , No. 16AP-332, 2017-Ohio-2739, ¶ 21, 2017 WL 1902015, *6 (Ohio Ct. App. 2017) ; Hyatt , 891 N.W.2d at 574-75 ; Holman , 418 Ill.Dec. 889, 91 N.E.3d at 863 ; People v. Padilla , 4 Cal.App.5th 656, 209 Cal.Rptr.3d 209, 220-21 (2016). In Bear Cloud II , we held that the sentencing court must consider the Miller factors in determining whether a juvenile offender is permanently incorrigible.
To fulfill Miller 's requirements, Wyoming's district courts must consider the factors of youth and the nature of the homicide at an individualized sentencing hearing when determining whether to sentence the juvenile offender to life without the possibility of parole or to life according to law. While not exhaustive, the Miller Court specifically indicated some factors for a trial court to consider at sentencing include:
(a) "the character and record of the individual offender [and] the circumstances of the offense," Miller, 567 U.S. at [475], 132 S.Ct. at 2467 (quotation marks omitted);
(b) "the background and mental and emotional development of a youthful defendant," id. ;
(c) a juvenile's "chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate the risks and consequences," id., 567 U.S. at [477], 132 S.Ct. at 2468 ;
(d) "the family and home environment that surrounds" the juvenile, "no matter how brutal or dysfunctional," id. ;
(e) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected" the juvenile, id. ;
(f) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," e.g., the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney, id. ; and
(g) the juvenile's potential for rehabilitation, id.
Bear Cloud II , ¶ 42, 294 P.3d at 47. In Sen I, we said:
in exercising its discretion with regard to a determination as to parole eligibility, the district court must set forth specific findings supporting a distinction between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.
*684 Sen v. State , 2013 WY 47, ¶ 51, 301 P.3d 106, 127 (Wyo. 2013) ( Sen I ) (emphasis added) (internal citation and quotation marks omitted).
[¶54] Thus, to reiterate our holdings in Bear Cloud II and Sen I , if the sentencing court sentences a juvenile offender to life or its functional equivalent, it must make a finding that in light of all the Miller factors, the juvenile offender's crime reflects irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. Further, to afford meaningful review, the sentencing court should carefully weigh each relevant Miller factor and set forth its reasoning when it determines whether the State has overcome the presumption that the juvenile is one of the majority of juveniles capable of rehabilitation. If the sentencing court does not consider a particular factor, it should explain its reasoning. Likewise, if the sentencing court evaluates additional factors not included in the "non-exclusive" list set forth in Bear Cloud II , it should set forth its findings with respect to those factors.
C. Is expert evidence required to support a Miller determination?
[¶55] Because "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption," Graham , 560 U.S. at 73, 130 S.Ct. at 2029 (quoting Roper , 543 U.S. at 572, 125 S.Ct. 1183 ); Miller , 567 U.S. at 479-80, 132 S.Ct. at 2469, we asked the parties to brief the issue of whether a Miller determination can be made without expert evidence aimed at answering the question of irreparable corruption. Neither the State nor Mr. Davis argue that expert testimony is constitutionally required to establish whether a juvenile is irreparably corrupt.
[¶56] "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" regarding his "scientific, technical or other specialized knowledge" if that testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." W.R.E. 702. Expert testimony is generally admissible at the discretion of the trial court, assuming the methodology used by the expert is reliable and the testimony "fits" the case. Bean v. State , 2016 WY 48, ¶¶ 22-26, 373 P.3d 372, 380-81 (Wyo. 2016). We agree with Mr. Davis when he states that "[i]t is difficult to imagine a case where the State would be able to prove that aggravating factors ... outweigh all mitigating [factors] without expert support." In addition, we can envision circumstances when a juvenile offender might want to introduce expert testimony relevant to the question of permanent incorrigibility. In Sen II , for example, the district court considered four psychological evaluations before making the determination that a life sentence without parole was inappropriate. Sen v. State , 2017 WY 30, ¶ 33, 390 P.3d 769, 778 (Wyo. 2017) ( Sen II ). However, we agree with the Pennsylvania Supreme Court's conclusion in Batts that whether expert testimony is required should be "determined on a case-by-case basis by the sentencing court." Batts , 163 A.3d at 456.
D. What evidence may the sentencing court consider in making retroactive Miller determinations?
[¶57] We also asked the parties to address the question of what type of evidence a sentencing court may properly examine when it makes a retroactive Miller determination, specifically whether the evidence is limited to what existed at the time of the original sentencing, or whether the court may consider other evidence such as a defendant's prison record. Mr. Davis and the State agree that a sentencing court may consider any accurate, relevant evidence, including the juvenile offender's prison record, when making a retroactive Miller determination.
[¶58] Miller and Bear Cloud II require sentencing courts to consider a wide variety of factors. Bear Cloud II , ¶ 42, 294 P.3d at 47 ; Miller , 567 U.S. at 475-77, 132 S.Ct. at 2467-68 ; see supra ¶53. Those factors are not exclusive. Id . The Montgomery Court recognized that in the context of retroactive application of Miller , an offender's prison record is especially relevant to the central issue:
*685 whether the juvenile offender can be rehabilitated. See Montgomery , 136 S.Ct. at 736 ( Montgomery 's prison record relevant to demonstrate rehabilitation). See also State v. Zuber , 227 N.J. 422, 152 A.3d 197, 216 (2017) (in making a retroactive Miller determination, the resentencing court should consider "any rehabilitative efforts since his original sentence"); but see Holman, 418 Ill.Dec. 889, 91 N.E.3d at 864 ("the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing").
[¶59] We agree. In making a retroactive Miller determination, the resentencing court may properly examine a defendant's prison record and any other relevant evidence existing at the time of the hearing. That is not to say, however, that the sentencing court should not also look retroactively to the juvenile offender's relevant characteristics at the time of his original sentencing. "There are baseline 'average developmental characteristics of youth of the age that the prisoner was when he or she committed the offense,' which the parties can then use as evidence of the juvenile's conduct after the offense to show the juvenile 'conformed to or departed from developmental norms.' " State v. Roby , 897 N.W.2d 127, 145 (Iowa 2017) (quoting Elizabeth Scott et al., Juvenile Sentencing Reform in a Constitutional Framework , 88 Temp. L. Rev. 675, 702 (2016) ).
E. What standard of review should this Court apply to its review of a Miller determination?
[¶60] Under Miller and Montgomery , a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the "rare" and "uncommon" children whose crimes are not the result of "unfortunate yet transient immaturity" characteristic of all juveniles. Montgomery , 136 S.Ct. at 726, 734 ; Miller , 567 U.S. at 479, 132 S.Ct. at 2469 ; see Graham , 560 U.S. at 73, 130 S.Ct. at 2029 ; Roper , 543 U.S. at 572-73, 125 S.Ct. at 1197. Thus, when the sentencing court conducts an appropriate individualized sentencing hearing and finds that the juvenile is irredeemable, a sentence of life without the possibility of parole is not unconstitutional.
[¶61] We have not yet articulated a standard of review for determining whether a sentencing court complied with Miller , Bear Cloud II, and Montgomery . The State contends that the sentence should be reviewed for abuse of discretion. In his opening brief, Mr. Davis agreed that our review should be for an abuse of discretion. We requested additional briefing on the issue and in his supplemental brief, Mr. Davis argued that the individualized hearing requirement originates in the Eighth Amendment, and therefore, an appeal from such a hearing has constitutional implications and should be subject to de novo review.
[¶62] We have applied different standards of review when a defendant challenges his sentence on appeal. When the challenged sentence is within statutory limits, we generally review for an abuse of discretion. See Sen II , ¶ 32 n.7, 390 P.3d at 777 n.7 (we will "not set aside a sentence if it within the legislatively mandated minimum and maximum terms in the absence of a clear abuse of discretion"); Butler v. State , 2015 WY 119, ¶ 12, 358 P.3d 1259, 1263 (Wyo. 2015). A "sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, and circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." Presbury v. State , 2010 WY 32, ¶ 6, 226 P.3d 886, 888 (Wyo. 2010) (citing Carothers v. State, 2008 WY 58, ¶ 23, 185 P.3d 1, 14-15 (Wyo. 2008) ). We review the legality of a sentence de novo, and we consider a sentence to be illegal when it violates the constitution or other laws. See Sen II , ¶ 26, 390 P.3d at 777 ; Bird v. State , 2015 WY 108, ¶ 9, 356 P.3d 264, 267 (Wyo. 2015) ; Deloge v. State , 2012 WY 128, ¶ 9, 289 P.3d 776, 778 (Wyo. 2012) ; Endris v. State , 2010 WY 73, ¶ 13, 233 P.3d 578, 581 (Wyo. 2010) ; see also Sweets v. State , 2013 WY 98, ¶ 19, 307 P.3d 860, 867 (Wyo. 2013) (de novo review of whether constitutional prohibition against double jeopardy had been violated). Finally, we review capital sentencing using *686 "heightened scrutiny." Olsen v. State , 2003 WY 46, ¶ 57, 67 P.3d 536, 559 (Wyo. 2003).
[¶63] Our review of the individualized sentencing hearing in this case calls for an examination of the district court's findings and its application of the Miller factors. Typically, such a review would be for an abuse of discretion. See Schaeffer v. State , 2012 WY 9, ¶ 51, 268 P.3d 1045, 1061 (Wyo. 2012) ("[w]hen imposing sentence, the trial court is given broad discretion to consider a wide variety of factors about the defendant and his crimes," and we "will not disturb a sentencing decision absent a clear abuse of discretion"); Gorseth v. State , 2006 WY 109, ¶ 15, 141 P.3d 698, 703 (Wyo. 2006) (same).
[¶64] The State cites State v. Ramos , 187 Wash.2d 420, 387 P.3d 650, 667 (2017), in support of its contention that our review should be for an abuse of discretion. In that case the Washington Supreme court stated that it was applying de novo review. Id . at 658. However, some of the language used by the court does sound more like an abuse of discretion review. For example, the court stated, "although we cannot say that every reasonable judge would necessarily make the same decisions as the court did here, we cannot reweigh the evidence on review." Id . at 667.
[¶65] Many courts do not articulate their standard of review when they examine juvenile sentences. For example, the Maryland Court of Special Appeals reviewed the sentence of a juvenile who was sixteen at the time he committed a murder. In reversing, the court commented that, while the sentencing court acknowledged his age and noted that it "did not see any hope of rehabilitation," it did not consider "youth and prospect for rehabilitation" in "any significant manner." Alvira v. State , No. 0960, 2016 WL 3548256, *2 (Md. Ct. Spec. App. 2016). Likewise, in Luna v. State , 387 P.3d 956 (Okla. Crim. App. 2016), the Oklahoma Court of Criminal Appeals determined that a jury that sentenced a 16-year-old to life without the possibility of parole, "in exercising discretion," did not appropriately take into account the special characteristics of youth or his potential for rehabilitation. Id . at 961-62. The court remarked that there was nothing in the record to support the jury's consideration of youth and its attendant characteristics. Id . at 962. Again, that court did not articulate a standard of review. See also State v. Barry , 886 N.W.2d 107 (Iowa Ct. App. 2016) (individualized sentencing hearing was conducted and appealed on grounds district court issued illegal sentences; because all required factors were considered, the sentence was affirmed; no standard of review was given); Commonwealth v. Page-Jones , No. 1581 WDA 2013, 2015 WL 7185501 (Pa. Super. Ct. 2015) (individualized sentencing hearing considered age-related factors in Miller before imposing sentence on juvenile for homicide, sentence was affirmed; no standard of review was given).
[¶66] Other jurisdictions have, however, applied an abuse of discretion standard. See, e.g. , State v. Louding , No. 2014 KA 1642, 2015 WL 3613194 (La. App. 1 Cir. 2015) (applying abuse of discretion standard of review to sentencing hearing challenge).
[¶67] Mr. Davis cites Commonwealth v. Batts , 163 A.3d 410, 434-36 (Pa. 2017), to support his argument that we should reject the abuse of discretion standard and apply a de novo standard of review. In Batts the Pennsylvania Supreme Court reviewed the imposition of a life without parole sentence after a post- Miller resentencing. The Batts court concluded that it would apply de novo review to the sentencing court's legal conclusions, but would defer to its factual findings:
[I]n the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. As stated by the Montgomery Court, "when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful." Montgomery , 136 S.Ct. at 729-30. As such, we must review the sentencing court's legal conclusion that Batts is eligible to receive a sentence of life without parole pursuant to a de novo standard and plenary scope of review. Because this legal conclusion is premised upon the presentation *687 of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.
Batts , 163 A.3d at 435-36 (some internal citations omitted). Batts , therefore, does not stand for the proposition that review of all the sentencing court's findings should be de novo. Rather, it takes a middle ground where review of the law is de novo and factual findings are given deference.
[¶68] The Supreme Court has recognized that a life-without-parole sentence for a juvenile is "akin to the death penalty" because it is the most severe penalty a juvenile offender can receive. Miller , 567 U.S. at 475, 132 S.Ct. at 2466. In Graham , the Court commented:
As for the punishment, life without parole is "the second most severe penalty permitted by law." Harmelin [v. Michigan ], 501 U.S. [957], at 1001, 111 S.Ct. 2680[, 115 L.Ed.2d 836 (1991) ] (opinion of KENNEDY, J.). It is true that a death sentence is "unique in its severity and irrevocability," Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable.
Graham , 560 U.S. at 69, 130 S.Ct. at 2027 ; see also Seats , 865 N.W.2d at 557 ("We must be cognizant of the fact that a sentence of life in prison without the possibility of parole for a juvenile is the equivalent of the death penalty for juveniles."). Our standards for reviewing capital cases, therefore, can provide some guidance:
The qualitative difference between a death sentence and all other punishments requires a correspondingly higher level of reliability. Johnson v. Mississippi, 486 U.S. 578, 584, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988) ; see also Engberg v. Meyer, 820 P.2d 70, 86 (Wyo. 1991). Capital sentencing determinations are therefore subject to our heightened scrutiny of all issues under the usual standards of review. See Engberg, 820 P.2d at 86.
Olsen , ¶ 57, 67 P.3d at 559 ; see also Harlow v. State , 2003 WY 47, ¶ 6, 70 P.3d 179, 184 (Wyo. 2003).[5]
[¶69] The Iowa Supreme Court recently concluded that it would apply what it referred to as an "abuse of discretion standard of review" in its review of a juvenile's sentence issued after a resentencing hearing. Roby , 897 N.W.2d at 137. However, a closer reading of its rationale reveals that the Iowa court will subject juvenile sentences to a heightened abuse of discretion standard of review:
[W]hen there is an appropriate sentencing procedure there is no constitutional violation. Under our existing law, if the district court follows the sentencing procedure we have identified and a statute authorizes the sentence ultimately imposed, then our review is for abuse of discretion; we ask whether there is "evidence [that] supports the sentence." Seats , 865 N.W.2d at 553.
However, we agree with a recent decision from a Michigan appellate court that "the abuse-of-discretion standard requires further explanation in this context." See People v. Hyatt , 316 Mich. App. 368, 891 N.W.2d 549, 576 (2016). Although the Michigan court was reviewing the imposition of a sentence of life without parole, we find the special considerations involved in sentencing a juvenile offender to an adult sentence similarly mean that, "even under this deferential standard, an appellate court should view such a sentence as inherently suspect ," and "cannot merely rubber-stamp the trial court's sentencing decision." Id. at 577-78. We too import this guidance from the Eighth Circuit:
A discretionary sentencing ruling, similarly, may be [an abuse of discre *688 tion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.
Id. at 578 (alteration in original) (quoting United States v. Haack , 403 F.3d 997, 1004 (8th Cir. 2005) ). In sum, while the review is for abuse of discretion, it is not forgiving of a deficiency in the constitutional right to a reasoned sentencing decision based on a proper hearing .
Roby , 897 N.W.2d at 137-38 (emphasis added).
[¶70] We are persuaded by the Iowa court's rationale and our own standards applied in capital cases. The Constitution requires a "meaningful" hearing before sentencing a juvenile to the harshest penalties. Bear Cloud II , ¶ 44, 294 P.3d at 47 (" Miller does mandate that a meaningful review ... be afforded by the sentencing court."). We will apply a similar standard in our review of individualized juvenile sentencing conducted pursuant to Bear Cloud II , Miller , and Montgomery. Our review is for an abuse of discretion, but will not be lenient. Like the Iowa Supreme Court, we will view the sentence as inherently suspect and demand rigor from the sentencing court in its factual findings, its application of the Miller factors, and the ensuing sentence. And, like the Pennsylvania Supreme Court, we will review the sentencing court's legal conclusions de novo.
5. Did the district court abuse its discretion when it conducted the individualized sentencing hearing and sentenced Mr. Davis to his original sentence?
[¶71] Mr. Davis contends that the district court abused its discretion when it sentenced him to his original sentence of life plus a consecutive twenty to fifty years. All of his arguments pertain to the individualized sentencing hearing and the district court's analysis of the Miller factors. He claims that the court failed to consider mitigating factors in a meaningful way, failed to provide an adequate Miller analysis, failed to consider and correctly apply the Miller factors, and that these failures led to the erroneous and statistically improbable conclusion that he is one of those rare juveniles worthy of a life without parole sentence. The State argues that the district court complied with Miller and Bear Cloud II , and therefore it did not abuse its discretion in sentencing Mr. Davis to his original sentence.
[¶72] We will examine whether the court's analysis of the Miller factors supported its conclusion. Properly applied, the Miller "factors ensure the constitutional guarantee against cruel and unusual punishment is satisfied." Roby , 897 N.W.2d at 145. The district court did not address the factors separately, but rather "as a narrative" because "several of the factors intermingle." This approach makes it difficult to assess what factors were analyzed by the district court and whether the court considered them to be aggravating or mitigating. In Sen I , we specified that in conducting a Miller hearing, the district court must "set forth specific findings supporting a distinction between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Sen I , ¶ 51, 301 P.3d at 127 (internal quotation marks omitted). Analysis of the Miller factors will ensure that this happens. See supra ¶¶37, 51-54.
[¶73] We now turn to the district court's findings to determine whether it abused its discretion in applying the Miller factors. Each of the district court's findings is in bold, and our analysis follows.
[¶74] "In the majority of the cases leading up to Miller v. Alabama , most defendants ranged in age between fourteen (14) and sixteen (16) and their young age was a great factor to take in to consideration at sentencing. That is not the case here. Defendant was literally days away from his eighteenth (18th) birthday at the time of the crimes."
[¶75] Miller requires consideration of the juvenile's "chronological age and its hallmark features-among them, immaturity, *689 impetuosity, and failure to appreciate the risks and consequences." See Bear Cloud II , ¶ 42, 294 P.3d at 47. This factor is the foundation for the constitutional protections given to juveniles under the Eighth Amendment. See Miller , Bear Cloud II , Sen , Sam v. State , 2017 WY 98, 401 P.3d 834 (Wyo. 2017). Because Mr. Davis was "days away from his eighteenth birthday" the district court discounted the importance of this factor, and (it is impossible to determine from the language used by the court) may have ignored Mr. Davis' youth or even weighed his age against him.
[¶76] Contrary to the district court's observation, the Miller Court established that violation of the Eighth Amendment occurs when offenders "under the age of 18 at the time of their crimes" are sentenced to mandatory life without parole. Miller , 567 U.S. at 465, 132 S.Ct. at 2460. "[A]ge is not a sliding scale that necessarily weighs against mitigation the closer the offender is to turning eighteen years old at the time of the crime." Roby , 897 N.W.2d at 145 ; see also Elizabeth S. Scott et al., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy , 85 Fordham L. Rev. 641, 647 (2016) (developmental stages occur beyond the teenage years and into the early twenties). Miller contains no suggestion that a seventeen-year-old is more deserving of adult punishment than a sixteen-year-old. Rather, Miller recognized that "youth is more than a chronological fact" and is "itself a relevant mitigating factor of great weight." Miller , 567 U.S. at 476, 132 S.Ct. at 2467 (citing Eddings v. Oklahoma , 455 U.S. 104, 115, 116, 102 S.Ct. 869, 877, 878, 71 L.Ed.2d 1 (1982) ). Miller referred to "youth" and "chronological age" to distinguish youthful offenders from adults and rested the distinction upon firm scientific ground. Miller, 567 U.S. at 471-72, 132 S.Ct. at 2464 (referring to "developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds").
[¶77] In Poitra v. State , 2016 WY 20, 368 P.3d 284 (Wyo. 2016), we rejected the argument that a nineteen-year-old should receive the same constitutional protections as juveniles, reasoning that "the law has drawn a bright line at the age of eighteen" and juveniles under that age are subject to specialized sentencing protections. Id. ¶ 25, 368 P.3d at 290. While science may support the suggestion that older teenagers and even offenders into their early twenties are still developing judgment and other qualities, see Scott, supra , 85 Fordham L. Rev. at 647, the law recognizes that juveniles under the age of eighteen have "signature qualities" of "immaturity, irresponsibility, impetuousness, and recklessness." Miller , 567 U.S. at 476, 132 S.Ct. at 2467 (internal citation and quotation marks omitted). Thus, youth is a factor that "supports the special sentencing consideration." Roby , 897 N.W.2d at 146. That is not to say, however, that expert evidence or other facts may not be used to conclude any particular juvenile offender possessed features of maturity beyond his or her years. Id . Our review of the record reveals no such evidence with respect to Mr. Davis. Accordingly, we find that the district court abused its discretion when it refused to take Mr. Davis' youth into account as a mitigating factor.
[¶78] "Taking the circumstances of the subject offence into consideration-the victim was hand-cuffed and his throat slit from one side to the other-Defendant's history of aggressive behavior is troubling. Defendant further conspired with his co-defendant in planning and executing the robbery-turned-homicide, and, there is nothing in either Defendant's original statement, nor his testimony to this Court, which suggests that he was pressured into committing the crime by someone else."
[¶79] This finding relates to the Miller factor that requires consideration of "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected the juvenile." Bear Cloud II , ¶ 42, 294 P.3d at 47. The nature of the crime alone will generally be insufficient to support a conclusion that a juvenile is irreparably depraved.
[N]early every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes *690 abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court.
Hyatt , 891 N.W.2d at 575 ; see also Adams v. Alabama , --- U.S. ----, 136 S.Ct. 1796, 1800, 195 L.Ed.2d 251 (2016) (Sotomayor, J., concurring, joined by Ginsburg, J.) (referring to the "Court's repeated exhortation that the gruesomeness of a crime is not sufficient to demonstrate that a juvenile offender is beyond redemption"); Padilla , 209 Cal.Rptr.3d at 221. Miller recognized that none of the characteristics that distinguish a child from an adult are "crime-specific." Miller , 567 U.S. at 473, 132 S.Ct. at 2465. Thus, the circumstances of the crime may not necessarily weigh against mitigation. Indeed, the "aggravating circumstances of a crime that suggest an adult offender is depraved may only reveal a juvenile offender to be wildly immature and impetuous." Roby , 897 N.W.2d at 146.
[¶80] Consideration of the circumstances of the offense requires more than an examination into the gruesomeness of the crime. It also contemplates consideration of "the juvenile's actual role and the role of various types of external pressure." Id . Expert testimony may be particularly helpful in explaining peer pressure and other influences that may not be "immediately evident." Id . Further, the absence of peer pressure is not an aggravating circumstance. Id . at 148.
[¶81] Here, the district court concluded that "there is nothing in either Defendant's original statement, nor his testimony to this Court, which suggests that he was pressured into committing the crime by someone else." However, there was testimony in the record indicating that Mr. Davis' codefendant told him to kill the victim before and after Mr. Davis had stabbed him. The district court also failed to recognize that "peer influence can play a more subtle role in adolescent behavior, as when teenagers engage in behavior that they think will win peer approval ... or simply encourage one another through group interaction." Scott, supra , 88 Temp. L. Rev. at 699. The district court also seemed to ignore that Mr. Davis was intoxicated at the time of the crime and that he acted with an adult codefendant, Mr. Cotton. Finally, the district court's findings appear to conflate Mr. Davis' and Mr. Cotton's intention to pick up and rob a hitchhiker-about which Mr. Davis told Mr. Cotton "not to worry about it, I'll think of something"-with an intent to kill the victim. Based upon these facts, we cannot agree that the district court's finding that the circumstances of the offense weigh against mitigation is supported by the record.
[¶82] "It appears that the Defendant was in juvenile detention for extended periods and that at least two (2) psychological evaluations were completed, both of which concluded that Defendant was uncontrollably aggressive and could fly into a rage from unpredictable triggers."
[¶83] This finding is relevant to the first and second Miller factors: "the character and record of the individual offender" and "the background and mental and emotional development" of the juvenile offender. See Bear Cloud II , ¶ 42, 294 P.3d at 47. We have several concerns with this finding. First, the evaluations relied upon by the district court were dated, even at the time of the original sentencing. Second, the district court extracted observations concerning aggression and rage and used them in a way that is not supported by the actual evaluations. Finally, the psychological examination done at the state hospital after Mr. Davis committed the homicide for which he was sentenced did not contain similar observations of uncontrollable aggression or unpredictable triggers.
[¶84] With regard to the timing of the evaluations on which the district court relied, they were completed years prior to the *691 crime. The first of the two referenced evaluations was completed in 1975, when Mr. Davis was in the fifth grade and seven years prior to the crime. The second evaluation was done in 1980, over two years prior to the crime. The lack of proximity of those evaluations to the homicide and the initial sentencing casts doubt upon their reliability and whether they support a continued finding that Mr. Davis was "uncontrollably aggressive and could fly into a rage from unpredictable triggers" even at the time of the original sentencing. They carry even less weight now. The PSI summarized those evaluations as follows:
A psychological evaluation performed on Donald on March 13, 1980 by Mark L. Berman, Ph.D. reported that information received from a diagnostic center in Michigan indicated Donald started to become a behavioral problem at home at the age of four years. He was a disturbing element in the classroom from the first grade through the fifth grade. In the latter grade, he was completely evaluated at the Diagnostic Center in Michigan. That evaluation showed Donald to have difficulties with "impulse control and overt aggression. The result was inpredictable [sic], uncontrolled aggression." The Diagnostic Center, in February of 1975, noted that "Don sometimes would fly into a rage and do destructive things without any apparent trigger, and that he frequently left home for several hours at a time, always returning at night." Further acting-out and unpredictable behavior (by Don) was observed by teachers in the school and it was recommended that he be placed in a special education program at the ninth grade level. In addition, Don's self-concept was quite poor at the time. Shortly thereafter, the family moved to Arizona.
The psychological report did mention that David Biegen, EED, conducted a psychological evaluation of the defendant on November 15, 1979. The [evaluation] found Donald to be a "very angry boy who is attempting to get even with his parents."
The psychological report performed at the Adobe Mountain School of Donald in April of 1980, further depicted Donald as seeing himself as "a total failure in life and that he is such a miserable person, that he and everyone else in the world necessarily should dump on him because of his badness." Mr. Berman, the evaluator, further elaborated, "I see Don at this time as being in a position emotionally in which he could very easily not only contemplate, but engage in self-damaging or even self-destructive behaviors." Mr. Berman felt that some of Don's behavioral and academic problems might be neurological in nature. He also felt additional sources of stress appear to include "his highly ambivalent home situation, (his mother having had a rather variable and changing relationship with her ex-husband, as well as the impact on the entire family of his step-father's alcoholism.) The evaluator saw the defendant as being highly emotionally constricted and confused in terms of how to work his way out of his current problems. The belief of Donald that he is a bad person and must act out that way, or if he wishes to follow what appears to be at least some well-defined positive instincts and engage in desirable behavior, creates a great deal of tension in Donald. Thus, he is very easily triggered-off to engage in very impulsive acts.
The full text of this evaluation does not support a conclusion that Mr. Davis "was uncontrollably aggressive and could fly into a rage from unpredictable triggers" at the time the PSI was prepared or even at the time of the second evaluation referred to in the PSI.
[¶85] After Mr. Davis was charged in this case, his attorneys raised concerns regarding his mental fitness to assist in his defense and be tried, and the district court ordered an evaluation by the state hospital. The state hospital evaluation found Mr. Davis able to assist in his defense and fit to be tried. That report states, in part:
Results of objective and projective psychological tests, as corroborated by the individual interview indicated that he is without a serious mental problem. He does not appear to be psychotic or mentally ill. His psychological difficulties appear to be essentially characterological in nature.
* * *
*692 ... On the ward, Mr. Davis displayed no bizarreness of behavior or speech. He was able to understand and comply with ward regulations. He socialized with others. He received no psychotropic medication.
The WSH report diagnosed Mr. Davis with alcohol dependence (continuous), cannabis abuse (episodic), intermittent explosive disorder, and antisocial personality disorder. The WSH report, however, did not contain observations of uncontrollable aggression or unpredictable triggers that were mentioned in the 1975 evaluation. It did state that his "psychological difficulties appear to be essentially characterological in nature." It is not clear what the term "characterological" means in this context. Maybe it means Mr. Davis' psychological condition is fixed, not temporary, but the report contains no explanation.
[¶86] The WSH report also did not define "intermittent explosive disorder" and "antisocial personality disorder." Perhaps the two diagnosed disorders suggest something related to uncontrolled aggression and unpredictable triggers noted in the much earlier evaluations, but the WSH evaluation does not report those types of observations or provide that link. Based upon this record, the district court abused its discretion when it concluded that Mr. Davis is "uncontrollably aggressive and could fly into a rage."
[¶87] "The Court further notes that at the time of the offense, Defendant was living independently from his family in Gillette, Wyoming, while his family lived in Michigan. He was also employed at a restaurant up until just a few days before the murder occurred, and it seems that he had maintained employment in various restaurants for approximately two (2) years prior to the events. In light of that, the Court finds that in spite of his youth, Defendant was in essence emancipated, and participating in society as an adult."
[¶88] The district court found that Mr. Davis was "emancipated, and participating in society as an adult." This finding relates to several Miller factors: the character of the offender, the juvenile's family and home environment, and the background and mental and emotional development of the juvenile. See Bear Cloud II , ¶ 42, 294 P.3d at 47. The record does not support the district court's conclusion that Mr. Davis was participating in society as an adult when he committed his crimes. The PSI notes that Mr. Davis attended school through the eleventh grade. The PSI also reports:
The defendant is currently residing at the Criminal Justice Center in Buffalo, Wyoming. He has been detained in that facility since his arrest on September 8, 1982, for the current offense. At the time of his arrest, he was living in a residence on Dogwood Street in Gillette, Wyoming. He cannot recall the exact address when he was staying in Gillette, WY.
The subject moved to Gillette, Wyoming in March, 1982 from the state of Michigan, where he was born and raised by his mother and step-father. ... In March, 1982, the family moved to Gillette, Wyoming, but only remained there for three months before again returning to Michigan.
While living in Gillette, the subject was employed as a cook at McDonald's Restaurant for three months. In June, 1982, he returned to Douglas, Michigan, where he rejoined his family and washed dishes in a restaurant for one month. He then returned to Gillette, Wyoming, and worked at the Mine Shaft Restaurant for several weeks before the restaurant was closed in late August, 1982. A few days later he was arrested for his connection with the immediate offense.
[¶89] The PSI summarized Mr. Davis' employment history from December 30, 1980 to the date of his crimes: Salad Bar Restaurant (Arizona) for about two weeks; Dairy Queen (Arizona) for one month; McDonald's (Gillette) for three months; Left Bank Restaurant (Michigan) for one month; and Mine Shaft Restaurant (Gillette) for about two weeks. The state hospital's report notes that Mr. Davis "has got no substantial work history." Both the PSI and WSH evaluation also note Mr. Davis' alcohol and drug abuse, which began when he was fourteen years old and continued up until the date of his crimes. Given this record, the district court's characterization of Mr. Davis as an essentially *693 emancipated minor functioning as an adult is erroneous.
[¶90] "The Court must also consider the potential of rehabilitation-in this case, it appears that even though the Defendant has been presented with, and completed, a vast range of programs aimed at assisting incarcerated persons ['] personal growth, Defendant still seems to maintain a violent and aggressive attitude based on statements he has made, and incidents he has been involved in, as described above. This also seems consistent with the reports from Defendant's youth as described in the PSI, wherefore the Court finds that rehabilitation is unlikely at this stage in Defendant's life."
[¶91] Potential for rehabilitation is a Miller factor which the district court considered. See Bear Cloud II , ¶ 42, 294 P.3d at 47. This factor supports mitigation for most juvenile offenders because the "signature qualities" of "immaturity and irresponsibility, impetuousness, and recklessness" are all "transient." Miller , 567 U.S. at 476, 132 S.Ct. at 2467 (quoting Johnson v. Texas , 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ). Most juveniles will outgrow the signature qualities of youth by the time their brain development is complete. See Scott, supra , 88 Temp. L. Rev. at 700. Juveniles are more likely to change with available treatment. Id . at 701. And, the seriousness of their crime does not alter these propositions. Id . at 700.
[¶92] The district court found rehabilitation to be "unlikely." In making that determination, the district court properly relied, at least in part, on Mr. Davis' prison record. See supra ¶21. We do not agree, however, that Mr. Davis' prison record supports this conclusion.
[¶93] The district court focused on violations that involved inappropriate statements by Mr. Davis to or about corrections staff. There were five of those, with the most recent occurring in 2012 ("What I'd give for five minutes in a cell with any one of these bitch made faggots and no consequences-I wouldn't hit him once and stop, I'd use the whole five minutes."). Mr. Davis' violations may very well be evidence of irreparable corruption/permanent incorrigibility; however, on the whole, Mr. Davis' prison record casts doubt upon the district court's conclusion. Mr. Davis has taken advantage of many classes and self-improvement programs. He has a job in the prison and resides in K unit, the working pod of the penitentiary, where an inmate must be free of write-ups for a year and meet other qualifications. During the duration of his over 34-year incarceration, Mr. Davis received only seventeen write-ups, never had a violent altercation, and was not charged with another crime.
[¶94] Further, Mr. Davis has not had a write-up since 2012. It is significant that during this time Mr. Davis was serving a life-without-parole sentence, with no hope of release. A life-without-parole sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." Graham , 560 U.S. at 70, 130 S.Ct. at 2027 (quoting Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 945 (1989) ).
[¶95] Perhaps this would be one area where expert evaluation or input would be helpful. Without such input, however, Mr. Davis' prison record simply does not support a conclusion that he is incapable of rehabilitation.
[¶96] In addition to the issues discussed above regarding the district court's findings, we would be remiss if we did not remark upon factors that should have been considered, but weren't. The district court failed to consider Mr. Davis' family and home environment in any meaningful way, and it failed to consider whether Mr. Davis "might have been charged ... [with] a lesser offense if not for incompetencies associated with his youth." Bear Cloud II , ¶ 42, 294 P.3d at 47.
[¶97] Regarding his family and home environment, the district court failed to take into account a number of facts that were in the record. For example, Mr. Davis was subjected to verbal, emotional and physical abuse at the hands of his stepfather. His peers bullied him both at school and when he was in the *694 juvenile treatment facilities. Ultimately, Mr. Davis left his family home at the age of seventeen due to the abusive relationship with his stepfather. These facts, and others contained in the record concerning Mr. Davis' family and home environment, should have been considered by the district court.
[¶98] With respect to whether Mr. Davis might have been charged and convicted of a lesser offence if not for the incompetencies of youth, the district court should have taken into account the circumstances surrounding his original plea. Mr. Davis' most pressing concern at the time of his plea was with being sentenced to death. Without the benefit of negotiations regarding a plea, he entered a plea of guilty to first degree felony murder. Two months later, he entered pleas on the remaining murder and aggravated robbery counts in accordance with a plea agreement in exchange for the State's agreement to a merged life sentence on the murder charges, with a consecutive twenty to fifty years on the aggravated robbery charge.
[¶99] Mr. Davis argues that a more mature defendant might not have entered a cold plea to the felony murder charge and that, without such a plea, the prosecutors might have amended the charges based upon the evidence that Mr. Cotton may have participated in the killing and that the murder was not premeditated. Mr. Davis also claims that a more mature defendant might have insisted on going to trial, rather than accepting a plea bargain for "the maximum penalty prescribed by law." While it is difficult to say what would have transpired, but for the incompetencies of youth, this mitigating factor was not considered by the district court.
[¶100] Other courts have concluded that when sentencing courts fail to adequately consider youth and its attendant characteristics, the sentence is constitutionally infirm. For example, the Oklahoma Court of Criminal Appeals addressed the appeal of a defendant who was convicted of first degree murder for fatally shooting the victim from a car as he was jogging. Luna , 387 P.3d at 958. Because the sentencing jury did not consider evidence of chronological age and its hallmark features or whether the circumstances suggested that the appellant could be rehabilitated, the court reversed. Id. at 962.
[¶101] In Alvira v. State , the defendant was convicted by a jury of first-degree murder, armed carjacking, armed robbery and other related offenses after carjacking and stabbing a woman, and dumping her body in a field, when he was sixteen. 2016 WL 3548256, *1-2. The Maryland Court of Special Appeals concluded that the sentencing court failed to properly consider the defendant's youth when it sentenced him to life without parole and additional consecutive and concurrent sentences. Id . at *2. The sentencing court acknowledged the defendant's age and stated that the defendant was "consumed with evil" on the night of the crime and that the court "expect[s] you are filled with evil. I do not see any hope of rehabilitation." Id . at *2. The reviewing court concluded that the record did not "reflect that Alvira's youth and prospect for rehabilitation were addressed in any significant manner" by the state, the defense or the sentencing court, and it reversed and remanded for resentencing. Id . at *2.
[¶102] Likewise, in People v. Hyatt , the defendant had been convicted of first-degree felony murder, conspiracy to commit armed robbery, armed robbery and possession of a firearm and was originally sentenced to life without parole for the first-degree murder conviction. 891 N.W.2d at 552-53. The Michigan Court of Appeals remanded the case for a new sentencing hearing. Id . at 579. The appellate court concluded that while the sentencing court considered the Miller factors, it committed "an error of law" when it "gave no credence to Miller 's repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender." Id. at 578-79. The court also admonished the sentencing court for its reliance on a psychologist's opinion that the defendant's prognosis for change in the next five years was poor. The court explained that this "focus on a short, five-year period for redemption cannot be reconciled with Miller , which holds that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of *695 change-not one who is incapable of change within the next five years." Id . at 579.
[¶103] The Iowa Supreme Court considered the aggregate sentence without the possibility of parole of a juvenile defendant who was convicted of two counts of sexual abuse that occurred when he was sixteen and seventeen years old.[6] Roby , 897 N.W.2d at 132. The Iowa Supreme Court concluded that the sentencing court abused its discretion when it: "misused" the factor of age by concluding that "the features of youth are overcome by the warning" the defendant had received about continuing to engage in sexual behavior with his victim; weighed the fact that the abuse occurred in the victim's home when her family was providing him with a home as an aggravating factor instead of considering his home life; failed to properly consider the role of peer pressure by weighing the absence of peer pressure against the defendant and not considering expert testimony on the question; ignored the question of the defendant's legal sophistication; and concluded that the defendant was incapable of rehabilitation when the only evidence was that he denied committing the crimes. Id . at 147-48. See also State v. Zarate , 885 N.W.2d 219 (Iowa Ct. App. 2016) (concluding that the sentencing court abused its discretion by not adequately considering the Miller factors, vacating the sentence, and remanding for further proceedings.).
[¶104] In the end, the district court's findings here illustrate how the failure to consider relevant facts, the failure to analyze all the Miller factors, and the failure to weigh those factors properly can amount to an abuse of discretion, causing the resulting sentence to violate the Eighth Amendment. Miller and Montgomery "make clear that sentencing a juvenile to life without parole is more than a simple consideration of a set of factors." Hyatt , 891 N.W.2d at 579. Montgomery establishes a stringent standard whereby a juvenile offender cannot be sentenced to life without parole unless the sentencing court determines, based upon its analysis of the Miller factors, that the juvenile is one of the truly rare individuals incapable of reform.
[¶105] In reimposing Mr. Davis' original sentence, the district court also did not explicitly find that he was permanently incorrigible. Rather, it concluded that Mr. Davis is "one of those rare cases where the sentence previously imposed was appropriate." Presumably this is a reference to the Supreme Court's holding that life without the possibility of parole for a juvenile offender is constitutional only for "the rare juvenile offender whose crime reflects irreparable corruption," Montgomery , 136 S.Ct. at 734, or stated another way, for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." Id . However, as we have explained here, supra ¶¶51-54, Miller and Montgomery require a sentencing court to make a finding that in light of the Miller factors, the juvenile offender's crime reflects irreparable corruption resulting in permanent incorrigibility, rather than transient immaturity. The district court abused its discretion when it failed to do so. See Padilla , 209 Cal.Rptr.3d at 220-21 (sentencing court failed to satisfy Miller and Montgomery when it failed to examine all of the Miller factors and "neither stated that appellant was irreparably corrupt nor made a determination of permanent incorrigibility").
CONCLUSION
[¶106] We find that the district court abused its discretion by weighing Mr. Davis' youth as an aggravating instead of mitigating factor; considering the nature of the crime to only a limited extent and failing to consider the participation and potential peer pressure of Mr. Davis' codefendant; placing undue significance on dated psychological evaluations; concluding that he was not capable of rehabilitation without the benefit of expert testimony concerning Mr. Davis's potential for rehabilitation, and by considering Mr. Davis' disciplinary record in prison without taking into account the fact that for the majority of his incarceration he had no hope of release, and without weighing his accomplishments *696 and personal growth while in the penitentiary. The district court's failure to consider Mr. Davis' family and home environment and whether he might have been convicted of a lesser offense but for incompetencies associated with youth, without providing an explanation for omitting analysis of those factors, also constituted an abuse of discretion. Finally, the district court abused its discretion by failing to make a finding of permanent incorrigibility based upon its analysis of all the Miller factors. When the Miller factors are not properly considered and weighed and when there is no finding of permanent incorrigibility, or when a finding of permanent incorrigibility is not supported by the Miller factors, the resulting sentence violates the Eighth Amendment.
[¶107] Accordingly, we reverse. At the time of the hearing and the district court's decision, the parties and the district court did not have the advantage of our rulings concerning the procedure, burdens, and potentially relevant evidence for a Miller determination, contained here. Consequently, remand for an additional sentencing hearing and resentencing is appropriate. On remand, the sentencing court should approach the case with the understanding that, more likely than not, life without parole is a disproportionate sentence for Mr. Davis, and it should consider the Miller factors and decide whether he is the truly rare individual mentioned in Miller who is incapable of reform.

At the arraignment, the State provided a similar factual basis for the charges:
[O]n September 7, 1982, [a Johnson County resident] advised the Sheriff's office that she had observed what she believed to be a dead body along the Mayoworth road ....
[A]t the location [law enforcement officers] observed a young Indian male approximately 20 years of age. Obviously dead from a large gaping throat wound with his hands handcuffed behind his back.
....
[O]n September 6th, 1982, [James Rowe] loaned his automobile, a 1973 Chevy Chevelle, to one Robert Cotton .... [Cotton and] Donald Davis traveled from ... Gillette to Buffalo ... and picked up a hitchhiker ..., who was the victim in this case. ... [T]hey traveled with [the victim] to Kaycee, Wyoming where they stopped in the Perry Filling station, obtained some gasoline; that they subsequently traveled from the filling station to a location approximately one half mile off of U.S. 87 on Mayoworth Road where they stopped at that time to urinate. They exited the vehicle three individuals; that at that time Mr. Cotton and the defendant, Mr. Davis, shoved the victim ... up against the car. A struggle ensued; that Mr. Davis subsequently placed handcuffs which he took from the-which he got from the Rowe vehicle on the victim; that he then took $5.00 from his person asking him for more money. ... [Mr. Davis] subsequently lifted his head using a large buck knife and began cutting his throat which was cut on numerous occasions ... [and that] ultimately cause[d] his death from blood loss.

Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ; Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

We address Mr. Davis' concerns regarding the hearing and the district court's findings elsewhere in this opinion. See infra at ¶¶ 71-105.

We do note a discord in our law that we encourage the legislature to address. In Bear Cloud III , we observed that "[a] juvenile offender sentenced to a lengthy aggregate sentence 'should not be worse off than an offender sentenced to life in prison without parole who has the benefit of an individualized [sentencing] hearing under Miller .' " Bear Cloud III , ¶ 34, 334 P.3d at 142 (quoting State v. Null , 836 N.W.2d 41, 72 (Iowa 2013) ). Accordingly, we held that the Miller sentencing protections applied equally to juveniles sentenced to life imprisonment and those sentenced to lengthy aggregate sentences. Id .
As recognized by the Supreme Court in Montgomery , Wyoming has accounted for juveniles sentenced to life imprisonment. By operation of Wyo. Stat. Ann. § 6-10-301(c), a juvenile defendant sentenced to life is eligible for parole after serving twenty-five years. The Wyoming Legislature has not, however, addressed parole eligibility for those juvenile offenders sentenced to consecutive sentences that are the functional equivalent to life without parole. Thus, while a juvenile defendant sentenced to life will be parole eligible after serving twenty-five years, a juvenile defendant sentenced to an aggregate sentence that is functionally equivalent to life without parole receives no such consideration. We urge the legislature to address this incongruity.

Capital sentences are subject to review in accordance with Wyo. Stat. Ann. § 6-2-103 (LexisNexis 2017). That statute sets forth procedural requirements for review and lists factors this Court should consider in a review of a capital sentence. See § 6-2-103(d).

Iowa has abolished mandatory minimum sentences for juveniles and requires individualized sentencing hearings when granting a minimum sentence without parole. See Roby , 897 N.W.2d at 143 ; State v. Lyle , 854 N.W.2d 378, 387-88 (Iowa 2014).