# In the Iowa Supreme Court

No. 23–1122

Submitted September 11, 2024—Filed  October 11, 2024

**State of Iowa,**

Appellee,

vs.

**Willard Noble Chaiden Miller,**

Appellant.

Appeal from the Iowa District Court for Jefferson County, Shawn Showers, Judge.

A defendant convicted of first-degree murder as a juvenile appeals his sentence of life imprisonment with the possibility of parole after serving thirty-five years. **Affirmed.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Ella M. Newell (argued) and Ashley Stewart (until withdrawal), Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, and Timothy M. Hau (argued) and Scott Brown, Assistant Attorneys General, for appellee.

**Christensen, Chief Justice.**

Worried that his poor Spanish grade might prevent him from studying abroad, the sixteen-year-old defendant recruited a friend and hatched a plan to kill his Spanish teacher. Together, the defendant and his friend spent weeks surveilling the teacher and developing a plan to ambush and kill her. After following through with this plan, the defendant bragged about his actions to another classmate, lied to the police about his participation, and later minimized his role in the teacher's death. He eventually entered an agreement to plead guilty to first-degree murder and admit to facts supporting each element of the charge. As part of this agreement, the defendant agreed that he could only challenge his sentence and not his guilty plea or conviction.

At his sentencing hearing, the State requested a sentence of life imprisonment with the possibility of parole after serving a minimum term of thirty years. The defendant sought parole eligibility with no minimum term of incarceration and argued that the district court could not impose a minimum sentence because the State failed to provide expert testimony to support its request for a minimum sentence. The district court rejected this argument and sentenced the defendant to a term of life imprisonment with the possibility of parole after serving a minimum term of thirty-five years.

We retained the defendant's appeal of his sentence in which he claims that sentencing juvenile offenders to a minimum term of incarceration before parole eligibility violates the Iowa Constitution. Alternatively, he contends that it is unconstitutional to impose a minimum term of incarceration if the State does not present expert testimony on the juvenile's psychological traits to prove that a minimum term is necessary. Finally, he maintains that the district court abused its sentencing discretion by improperly applying the juvenile sentencing

factors and presuming that a minimum term of imprisonment was necessary. For the reasons explained below, we disagree and affirm the district court's sentencing decision.

## I. Background Facts and Proceedings.

In the fall of 2021, sixteen-year-old Willard Miller was struggling to pass Nohema Graber's Spanish class at Fairfield High School. Upset that this would interfere with his desire to study abroad in Spain and feeling like Graber treated him unfairly, Miller began making what he called "dark jokes" about killing Graber to friends. These friends included Jeremy Goodale, who indicated he would help Miller kill Graber. For at least two weeks, the pair planned Graber's murder in detail. They surveilled Graber to learn her routine, made a list of supplies, and developed a plan to strike Graber from behind with a baseball bat during her daily walk at Chautauqua Park.

On October 24, Miller performed multiple internet searches on his iPhone, such as, "[W]hat happens to students work if the teacher dies in the middle of a term," and "Do students receive credit for a class if the professor is seriously injured or dies more than halfway through the course?" An October 30 note on Miller's iPhone titled "Prep" further details the pair's plan to kill Graber, listing the following necessary supplies for the act: bush clippers, sticks, garden gloves, plastic gloves, trash bag, Ziploc bag, wet wipes, backpack, hammer, cover, and transport vehicle. Miller also detailed the "[p]rocedure" to kill Graber in that note, writing,

> Stun, move off trail, empty compartments, load cargo, blanket cargo, deactivate compartment contents, leave bag by exit, transport, empty transport, safety stun, switch glove, deactivate article to bag, finalize the win (secure victory), load into storage spot, don't forget to close the door to the ground, switch glove, move the sticks, wipe down tools, dispose article and grab bag by exit. Done.

Around this time, Miller told a classmate that he knew Graber's routes and could easily hit her with a bat if he wanted. Moreover, he told the classmate not to go to the police "out of rashness" if Graber went missing in the next two weeks.

On November 2, Miller and his mother met with Graber at the high school to discuss improving Miller's classroom performance, and Miller claimed the meeting went well. Later that afternoon, Graber left the school to go for her usual walk at Chautauqua Park. Unbeknownst to her, Goodale and Miller were already there waiting for her.

After Goodale gave Miller the all clear signal, Miller struck Graber in the head with a baseball bat.[1] Miller hit her a few times before giving Goodale the bat. According to Goodale, Graber was not dead when Miller gave him the bat, so Goodale struck her again.

They subsequently dragged Graber into the woods, took the keys to her van, and moved the van into a wooded area beyond a dead end. They also took $75 from Graber's wallet, and Miller decided Goodale should get $40 of it because Miller had recruited him. The two parted ways before reconvening to dispose of Graber's body near midnight. Before heading to the park, Goodale stopped by Miller's home to retrieve a red wheelbarrow that Miller had left outside of his house for Goodale to bring. Goodale also brought a tarp and shovel, while Miller brought an air pump in case the wheelbarrow's tire went flat.

When Goodale arrived in the park, he found Miller using a flashlight and disinfectant wipes to spot and clean blood from the trail. The pair moved Graber's

---

[1]Miller denied striking Graber with the bat when he was offering his guilty plea, claiming Goodale struck Graber with the bat while Miller only acted as lookout. However, the minutes of testimony do not support that claim, and Miller agreed that the district court could use those minutes of testimony in determining whether there was a factual basis to support his plea.

body again with plans to bury it before they realized the ground was too frozen for digging. They opted to cover the body with a tarp and wheelbarrow instead.

Graber's husband reported her missing the next morning, as he had been out of town the previous day, and the police discovered Graber had not arrived for work. This led to a community-wide search, and it was not long before Graber's body was discovered in the woods. Meanwhile, Miller told a classmate, "I caught a body with a baseball bat," when the class was wondering about Graber's absence. Goodale was more brazen in his communications, messaging multiple people on Snapchat to detail how he and a friend killed Graber because she "failed the wrong students." The recipients of these messages went to the police with pictures of the messages.

In his police interview, Miller initially denied any knowledge of Graber's murder. He subsequently changed his story multiple times. The recurring event in each variation of Miller's story was that he was in the park when he encountered a group of masked individuals—including Goodale—dragging Graber's body. When asked if there was any chance that his DNA would be found at or near the crime scene, Miller stated that Goodale and two others approached him and pressured him into letting them use Miller's wheelbarrow to move the body.

Miller was taken into custody, where he was reunited with Goodale. He told Goodale "to say there were eight . . . people from Ottumwa involved in Mrs. Graber's murder" because Miller "had made up a very convincing lie that would throw [the police] off." The State charged Miller with murder in the first degree, a class "A" felony, in violation of Iowa Code section 707.2(1)(*a*) (2021),

and Miller pleaded guilty on April 19, 2023.[2] Shortly thereafter, the department of correctional services filed a presentence investigation (PSI) report opposing a suspended sentence for Miller. Miller had no objections to the district court's use of the PSI.

At Miller's sentencing hearing, the State urged the district court to sentence Miller to a term of life with the possibility of parole after serving a minimum of thirty years imprisonment. To support this sentence, it submitted several exhibits and victim-impact statements and offered testimony from four witnesses. Two special agents from the Iowa Division of Criminal Investigation testified about their investigation into Graber's death. Similarly, the lead officer on the case for the Fairfield Police Department discussed the investigation and the impact of Graber's murder on the community.

Additionally, Mike Heinricy, the warden of Iowa Medical and Classification Center at Oakdale,[3] who helped spearhead Oakdale's youthful offender program, testified about the individualized programming Miller would receive as a youthful offender in prison. He also discussed how a minimum sentence tends to delay certain programming until the inmate approaches the end of the minimum term. The State concluded its sentencing recommendation by focusing on the factors listed in Iowa Code section 902.1(2)(*b*), which govern sentencing for first-degree murder when the defendant committed the act as a juvenile, and how they related to Miller's offense.

Miller sought a term of incarceration with no minimum sentence before he would become parole eligible, and he filed an accompanying sentencing

---

[2]Goodale pleaded guilty to the same charge and was sentenced to life with the possibility of parole after a term of twenty-five years imprisonment.

[3]This is the reception center for all prisoners in Iowa.

memorandum discussing how the section 902.1(2)(*b*) factors applied to his case. Miller also filed eighteen letters of support "showing [his] positive influence on family, friends, and community" and several photos with family members or "showing community engagement." Although Miller acknowledged his guilt in planning the murder and acting as a lookout for Goodale, he disagreed with the State's contention that he struck Graber with the bat.

Moreover, Miller argued the State had the burden under our juvenile sentencing precedent to present expert testimony in support of its request for a minimum sentence and failed to do so. Thus, Miller declared, the district court could not impose a minimum sentence for Miller before he became parole eligible. Although Miller insisted on expert testimony from the State and even submitted the curriculum vitae of Dr. Craig Rypma as a sentencing exhibit, Miller did not present any expert testimony to support his requested sentence.

He concluded his sentencing request with a statement of allocution that included apologies to Graber's family and church, the community, his own family, the Goodale family, and the police department and investigators for "the role that [he] played in the murder of Nohema Graber." Later, he said, "I know what I did was wrong, and I accept responsibility for my carelessness, for my ignorance."

In his apology to his family, Miller stated, "I'm really sorry for what I've done, and I love you, and I'm planning on getting back out there as soon as I can to make up for the lost time." Similarly, in his apology to Goodale's family, he expressed his desire that Goodale "gets out as soon as possible." In conclusion, he declared, "I ask that I'm given a chance. And I don't want to be institutionalized. I don't want to be in so long that I forget about what matters,

where I come from, and what I need to do. I look forward to getting through this. Thank you."

The district court sentenced Miller to a term of life with the possibility of parole after serving a minimum of thirty-five years imprisonment. Accordingly, it rejected Miller's argument that it could not impose a minimum term of incarceration because the State did not provide expert testimony. The district court reasoned that the decision to impose a minimum "normally would be a matter for expert testimony. [However,] [t]his is far from a normal case. And to the extent the mandatory minimum is an issue, I think the facts and circumstances of this case demand it, and I would not be doing my job if I didn't impose some sort of mandatory minimum."

The district court offered a thorough explanation for its sentencing decision at the hearing that showed its consideration of Iowa Code section 902.1(2)(*b*)(2)(*a*)–(*v*), walking through the individual factors in order. It first considered "the impact of the offense on each victim," which if found "to be an aggravating factor" based on the victim-impact statements from Graber's family and friends and the impact on the community. Next, it concluded that the threat Miller posed to public safety was an aggravating factor because "any individual who would plan and participate in a murder based on an unsatisfactory grade is an individual that will require immense rehabilitation." This was also part of the district court's reason for imposing a minimum sentence, as it remarked, "If I gave the Board of Parole the option to release you without a mandatory minimum, it would be contrary to the public safety of the community you would reside in and to the residents of the community you reside in."

The district court elaborated,

> The degree of participation in the murder by you is another factor I've considered. It's an aggravating factor. The reason that Nohema Graber was murdered was because you were unhappy with your grade. But for your thoughts, planning, and acts, Nohema Graber would still be alive.
>
> Mr. Miller, you and Mr. Goodale committed premeditated murder of your teacher, and it was carried out in one of the most horrific fashions one could imagine, which goes to the nature of the offense, which is an aggravating factor.
>
> Planning the murder by stalking Mrs. Graber, her walking route, bringing supplies such as a wheelbarrow and a baseball bat, then beating the victim lifeless is a horrific act. It calls for swift justice, deterrence, and accountability.
>
> With regard to your remorse, you waited until today to show some sort of remorse for the act that you and Mr. Goodale committed. I find that you downplayed your role in this homicide based on your admissions and the Minutes of Testimony and the evidence presented in this sentencing hearing. It's an aggravating factor.
>
> [You told] [t]he State's witness . . . , a fellow classmate of yours[,] . . . that you caught a body with a baseball bat. While the defendant is remorseful for his current situation, there has been little remorse shown by Mr. Miller for Nohema Graber, her family.
>
> I think State's Exhibit 131 [of Miller's iPhone note] shows the extent of the premeditation, to "finalize the win" or "secure a victory" when describing the murder of the defendant that you -- the murder that you and the defendant, Jeremy Goodale, committed.

Other aggravating factors included Miller's intellectual and mental capacity and ability to conform his conduct with the requirements of the law, as "[t]here's no indication [Miller] had any issues prior to [this murder] complying with the law or societal norms." Miller's recruitment of Goodale to help kill Graber was another aggravating factor. And the district court reported that "[t]he overall heinous, cruel, and painful murder is an enormous aggravating factor," though "there only being one murder victim as opposed to several . . . [is] a

microscopic mitigating factor." One factor it specifically remarked was not mitigating was Miller's competency dealing with the criminal justice system because Miller was "zealously represented by experienced and talented attorneys and [was] able to present a very thorough defense."

The district court found that other factors required mixed consideration or treatment as a mitigating circumstance. The mitigating factors included Miller's age at the time of the offense, lack of previous criminal record, and acceptance of responsibility by pleading guilty, which "spared the victim's family, witnesses, and the Fairfield community a protracted trial where the details of this brutal act would be recounted." So, too, was the possibility of rehabilitation. Nevertheless, the district court mentioned Miller appeared to be just beginning his "journey towards rehabilitation" based on the "warnings and consequences for various infractions" he had received in detention.[4]

A mixed factor for the district court was Miller's capacity "to appreciate the criminality of his conduct." It explained,

> Most of the science I'm familiar with states that a human being's brain isn't fully developed until they're 25. Certainly, based on your immaturity, you did not likely think too deeply about what happens to individuals who plan and execute a murder. You knew what you were doing; whether you appreciated how wrong it was raises an urgent rehabilitation red flag for me. Deterrence and rehabilitation require the Court to sentence you to a lengthy prison sentence.

---

[4]From November 13, 2021, through May 28, 2023, Miller committed numerous rules violations at the South Iowa Area Detention Service Agency. According to the PSI, Miller received multiple warnings and minor consequences for—among other things—making inappropriate and unnecessary comments, horseplay, verbally assaulting another juvenile with the threat of physical violence, arguing with staff, and staff manipulation. Perhaps the most troubling is a seemingly threatening note from Miller that a staff member intercepted describing the name and appearance of a witness who gave key information against him to the police, along with information on where that witness routinely parks at school, what school doors the witness usually enters, a description of the witness's vehicle, and when school starts and ends.

Likewise, the district court determined Miller's maturity was a mixed factor "because it is a mitigating factor that you were 16 when you committed this crime. However, you're also an intelligent young man."

After going through these factors, the district court gave the following summary for its decision to impose a minimum term of thirty-five years before Miller would become parole-eligible:

> [A] high schooler that formulates a plan with his friend and murders his Spanish teacher is a dangerous person to the community.

> The definition of malice is the intention or the desire to do evil, and evil does not have a birthday. This Court cannot overrule precedent. However, I will not gloss over the fact that you and Mr. Goodale cut Nohema Graber's precious life short. That will not be justice, regardless of your age, Mr. Miller.

> The bedrock of our criminal justice testimony is deterrence and rehabilitation. And, ultimately, while acknowledging your youth and developing brain, I find that your intent and actions were sinister and evil. Those acts resulted in the intentional loss of human life in a brutal fashion. There's no excuse. There is not a systemic societal problem that explains or justifies your actions.

Miller filed a timely appeal, which we retained.

## II. Standard of Review.

We review Miller's constitutional challenges to his sentence de novo. *See State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017). If we conclude his sentence is constitutional, we then review it for an abuse of discretion with a strong presumption in its favor because it falls within the statutory limits. *See State v. Majors*, 940 N.W.2d 372, 385–86 (Iowa 2020). A discretionary sentence is improper if the district court's decision to impose it "was unreasonable or based on untenable grounds." *Id.* at 387 (quoting *State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002)). In the juvenile sentencing realm, an abuse of discretion may occur when the district court fails to consider the appropriate sentencing factors,

inappropriately weighs these factors, or "commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." *Id.* at 385 (quoting *Roby*, 897 N.W.2d at 138).

**III. Analysis.**

We first address Miller's claim that sentencing juvenile offenders to a minimum term of incarceration before parole eligibility violates article I, section 17 of the Iowa Constitution. Alternatively, he contends it is unconstitutional to impose a minimum term if the State does not present expert testimony on the juvenile's psychological traits to prove a minimum is necessary. Should we reject these constitutional challenges, Miller still maintains that the district court abused its sentencing discretion because it started with the presumption that a minimum term of imprisonment was necessary and improperly applied the juvenile sentencing factors. Because Miller is attempting to alter the constitutional landscape of our juvenile sentencing jurisprudence, an overview of this legal background is necessary.

**A. Summary of Our State and Federal Juvenile Sentencing Precedent.** Both the Iowa and United States Constitutions prohibit cruel and unusual punishment based on the " 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). Beginning in 2005 with *Roper v. Simmons*, 543 U.S. 551, the United States Supreme Court issued a trilogy of juvenile sentencing rulings that served as the catalyst for major changes in Iowa's juvenile sentencing laws. In *Roper*, the Supreme Court held that capital punishment for juvenile offenders constitutes cruel and unusual punishment based on the differences in maturity, sense of responsibility, vulnerability to peer pressure and negative influences,

and the development of personality traits between juvenile and adult offenders. 543 U.S. at 568–70. The Supreme Court expanded this approach in *Graham v. Florida*, 560 U.S. 48, 74 (2010), ruling that it was unconstitutional to sentence juvenile offenders convicted of nonhomicide offenses to life imprisonment without the possibility of parole.

Last, in *Miller v. Alabama*, 567 U.S. at 479, the Supreme Court prohibited all mandatory sentences of life imprisonment without the possibility of parole for juvenile offenders. It stressed, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477. Accordingly, juvenile offenders are entitled to individualized sentencing decisions that consider their age and its related characteristics before imposing a life sentence without the possibility of parole. *Id.* at 489.

We followed suit, starting with *State v. Ragland*, 836 N.W.2d 107, 110–11, 122 (Iowa 2013), in which we held that the Governor's commutation of life without parole sentences to sentences of sixty years without parole and no credit for earned time were *de facto* sentences of life without parole that required the same individualized sentencing set forth in *Miller*. Next, we applied *Miller*'s individualized sentencing requirement to a fifty-two and one-half-year sentence in *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013), "because an offender sentenced to a lengthy term-of-years sentence should not be worse off than an offender sentenced to life in prison without parole who has the benefit of an individualized hearing." And in *State v. Lyle*, 854 N.W.2d 378, 403 (Iowa 2014), we held that article I, section 17 of the Iowa Constitution "prohibits the one-size-fits-all mandatory sentencing for juveniles."

Nevertheless, we clarified that "this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole." *Id.* We also established the following factors for a district court to consider in determining whether a minimum period of incarceration without parole is warranted:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Id.* at 404 n.10 (quoting *Miller*, 567 U.S. at 477).

We continued to expound upon these factors for years to come, including in *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016), in which we categorically banned sentencing juvenile offenders to life without the possibility of parole under article I, section 17 of the Iowa Constitution. But a year later, in *State v. Roby*, 897 N.W.2d at 143, 148, we declined to categorically prohibit sentencing juvenile offenders to any minimum term of incarceration without the possibility of parole for a juvenile offender convicted of sexual abuse in the second and third degrees. *See also id.* at 150 (Zager, J., dissenting) ("[T]he court correctly concludes that the Iowa Constitution does not categorically prohibit a district judge, after a hearing on all relevant factors, from sentencing a juvenile who commits a serious felony such as rape, armed robbery, or murder, to a minimum period of incarceration before the juvenile is eligible for parole."). Although a majority in *Roby* agreed to vacate Roby's sentence and remand for resentencing,

one justice only concurred in judgment. *See id.* at 149 (Hecht, J., concurring specially). The remaining plurality that vacated Roby's sentence elaborated on the *Lyle* sentencing factors, declaring that they should generally mitigate the punishment of a juvenile offender so that district courts can craft a "punishment that serves the best interests of the child." *Id.* at 144 (plurality opinion) (quoting *Lyle*, 854 N.W.2d at 402). In doing so, the plurality urged courts to be aware that "juvenile sentencing hearings are not entirely adversarial" and "the default rule . . . is that [juveniles] are not subject to minimum periods of incarceration." *Id.*

The next year, we again concluded that the Iowa Constitution does not categorically prohibit sentencing juvenile offenders to a minimum term before parole eligibility in *State v. Zarate*, 908 N.W.2d 831, 846 (Iowa 2018). There, Zarate was convicted of first-degree murder as a juvenile offender and sentenced under Iowa Code section 902.1(2)(*a*)(2) to life imprisonment with the possibility of parole after a twenty-five-year minimum term of imprisonment. *Id.* at 837–39. We rejected Zarate's claim that the sentencing options in Iowa Code section 902.1(2)(*a*)(2)–(3)[5] for juveniles convicted of first-degree murder were unconstitutional because they did not provide the district court with the discretion to impose a term-of-years sentence. *Id.* at 847–48.

And most importantly to Miller's appeal, we held that article I, section 17 of the Iowa Constitution did not categorically prohibit sentencing juveniles convicted of first-degree murder to "life with the possibility of parole after serving a minimum term of confinement as determined by the court." *Id.* at 843, 856

---

[5]We acknowledged that Iowa Code section 902.1(2)(*a*)(1) was unconstitutional based on our holding in *Sweet* because it allowed the district court to sentence a juvenile offender to life imprisonment without the possibility of parole. *Zarate*, 908 N.W.2d at 843. That did not render the rest of the statute unconstitutional. *See id.* at 843–44.

(quoting Iowa Code § 902.1(2)(*a*)(2)). Since *Zarate*, we have affirmed multiple minimum sentences involving juvenile offenders. *See, e.g., Majors*, 940 N.W.2d at 387 (affirming a juvenile offender's seventeen and one-half-year minimum term before parole eligibility); *Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 637 (Iowa 2019) (affirming a twenty-year minimum for a juvenile offender). This includes our decision in *State v. Majors*, in which we rejected a juvenile offender's claim that "his trial counsel had a duty to present an expert witness to testify regarding the five sentencing factors." 940 N.W.2d at 391, 393.

**B. The Iowa Constitution Does Not Categorically Ban Sentencing Juvenile Offenders to Minimum Terms of Incarceration.** Miller maintains that juvenile minimum sentences are unconstitutional under article I, section 17 of the Iowa Constitution regardless of the individualized sentencing process. We thoroughly examined this categorical challenge in *Zarate*, and Miller concedes that most jurisdictions allow minimum sentences for juvenile offenders if they receive an individualized sentencing. *See* 908 N.W.2d at 844 nn.2–4, 850 n.5 (surveying juvenile sentencing schemes in other states); *see also Burrell v. State*, 207 A.3d 137, 144–45 (Del. 2019) (discussing persuasive authority from other state courts that have upheld juvenile minimum sentences); *State v. Comer*, 266 A.3d 374, 393–94 (N.J. 2022) (noting many states have not followed our holding in *Lyle* concerning minimum sentences for juvenile offenders). We also evaluated the penological goals and determined that minimum terms of incarceration before parole eligibility for juvenile offenders "align with our focus on rehabilitation" and "promote other legitimate penological goals like retribution, deterrence, and incapacitation." *Zarate*, 908 N.W.2d at 847.

Frankly, little has changed in the six years since *Zarate*. And "[w]hile there is a presumption against minimum terms of incarceration for juvenile offenders,

we have expressly upheld, even commanded, their use if the court concludes that sentence is warranted after consideration of the factors." *Majors*, 940 N.W.2d at 387. Miller offers no discussion on *Zarate* or why we should disregard stare decisis to overturn it. Nor does the State ask us to overturn any of our juvenile sentencing precedents. Our decisions in *Zarate* and the subsequent cases following it remain good law, and the Iowa Constitution does not prohibit sentencing juvenile offenders to a minimum term of incarceration before parole eligibility as long as the offender receives an individualized sentencing that covers the *Miller/Lyle/Roby* factors.

**C. Expert Testimony Is Not Required to Impose a Minimum Sentence for Juvenile Offenders.** Miller maintains that it is cruel and unusual punishment under the Iowa Constitution to sentence juvenile offenders to a minimum term of incarceration before parole eligibility absent expert testimony concerning their youthful characteristics. Additionally, he contends the State has the burden to present that expert testimony because it must combat the presumption against a minimum by "prov[ing] that a youthful offender falls outside of the normal and generally accepted psychological makeup."

We analyze Miller's categorical challenge to minimum sentences imposed without expert testimony through a two-step inquiry. *See Zarate*, 908 N.W.2d at 844. First, we examine objective indicators, including state practices and legislative enactments, to determine whether there is a national consensus on the challenged sentencing practice. *Id.* at 842–43. Second, we review "our controlling precedents and our interpretation of the Iowa Constitution's text, history, meaning, and purpose to guide our own independent judgment on the constitutionality of the challenged sentence." *Id.* at 843. This includes a

consideration of "whether the challenged sentencing practice serves legitimate penological goals and the culpability of the offender at issue." *Id.* at 847.

Regarding the first step, there is no national consensus against sentencing a juvenile offender to a minimum term of incarceration before parole eligibility without expert testimony. Miller recognizes this, noting most states have not even addressed the issue, and "no other court has held there is a constitutional requirement for an expert to testify during a juvenile sentencing." On the contrary, at least three states have explicitly held that an expert is not required for juvenile sentencings. *See Love v. State*, 848 S.E.2d 882, 842 (Ga. 2020) ("[N]othing in *Miller*, *Montgomery*, or *Veal* requires the use of an expert to aid a court in making a determination that a juvenile offender is irreparably corrupt."); *Commonwealth v. Batts*, 163 A.3d 410, 455–56 (Pa. 2017) ("We decline, however, to go so far as to hold that expert testimony is constitutionally required to rebut the presumption against the imposition of a sentence of life without the possibility of parole."), *overruled on other grounds by Jones v. Mississippi*, 593 U.S. 98 (2021) (overruling *Batts*'s holding that the district court must make a finding that the juvenile offender is permanently incorrigible before imposing life without parole); *Davis v. State*, 415 P.3d 666, 684 (Wyo. 2018) (holding expert testimony is not required for the district court to make a finding that a juvenile offender is irreparably corrupt).

And the Supreme Court has gone further, "unequivocally stat[ing] that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Jones*, 593 U.S. at 113. At best, state courts have remarked that expert testimony is helpful but not mandatory. *See, e.g., Moore v. State*, 287 So. 3d 905, 920 (Miss. 2019) (en banc) ("We have never held that expert testimony is required

in a *Miller* hearing. . . . This is not to say that a specific case may not arise in which expert testimony could be helpful and could be allowed."); *State v. Mack*, 894 S.E.2d 820, 828–29 (S.C. Ct. App. 2023) (noting expert testimony is useful but courts need not have expertise in child development to account for a child's age in juvenile sentencings); *Davis*, 415 P.3d at 690, 693 (discussing when expert testimony may be helpful in examining certain juvenile sentencing considerations).

Just as no national consensus exists among courts in favor of requiring expert testimony before a juvenile court can sentence juvenile offenders to a minimum term of incarceration, our legislature has not established an expert testimony requirement for juvenile sentencings involving the possibility of a minimum term. Following *Miller* and *Lyle*, the legislature enacted Iowa Code section 902.1(2), establishing a separate sentencing system for juveniles like Miller who are convicted of a class "A" felony. *See* 2015 Iowa Acts ch. 65, § 1 (codified at Iowa Code § 902.1(2) (2016)). This statute provides twenty-two factors that the district court must consider in determining a juvenile offender's sentence, including many factors associated with the characteristics of youth. *See* Iowa Code § 902.1(2)(*b*)(2)(a)–(v). Yet, nothing in this statute requires the district court to consider expert testimony. *See id.*

The second step in this inquiry requires us to use our own independent judgment on the constitutionality of the challenged sentencing practice based on our controlling precedents and the Iowa Constitution's text, history, meaning, and purpose. *Zarate*, 908 N.W.2d at 843. We also must consider "whether the challenged sentencing practice serves legitimate penological goals." *Id.* This includes assessing "the culpability of the offenders at issue in light of their crimes and characteristics along with the severity of the punishment in question."

*State v. Harrison*, 914 N.W.2d 178, 200 (Iowa 2018) (quoting *Lyle*, 854 N.W.2d at 386). These considerations all weigh against Miller's proposed categorical ban on sentencing juvenile offenders to a minimum term of incarceration absent expert testimony.

The text, history, meaning, and purpose of our constitution clearly do not support a categorical ban on sentencing juvenile offenders to a minimum term absent expert testimony. After all, "juveniles over the age of fourteen were tried and sentenced as adults when our constitution was adopted," *Zarate*, 908 N.W.2d at 846, and "our laws mandated capital punishment for first-degree murder," *State v. Seats*, 865 N.W.2d 545, 575 (Iowa 2015) (Mansfield, J., dissenting); *see also* Iowa Code § 2569 (1851). Accordingly, we upheld a death sentence imposed upon a sixteen-year-old who murdered his aunt and cousin a few decades after our constitution was adopted. *State v. Dooley*, 57 N.W. 414, 417 (Iowa 1894).

Miller correctly notes that we have emphasized the benefits of expert testimony for juvenile sentencings in the past, especially in *Roby*. For example, the plurality opinion in *Roby* states that "expert evidence *may* be used to conclude any particular juvenile offender possessed features of maturity beyond his or her years," and "[e]xpert testimony *will be helpful* to understand the complexity behind the circumstances of a crime when influences such as peer pressure are not immediately evident and will aid the court in applying the factor properly." 897 N.W.2d at 146 (emphases added). Likewise, it opined that reaching conclusions on certain factors "would *normally* be a matter for expert testimony." *Id.* at 147 (emphasis added). Yet, it did so in the context of providing guidance for district courts on how to apply the juvenile sentencing factors. Nothing in *Roby* requires the use of expert testimony in juvenile sentencings.

Since *Roby*, we have stressed "that these sentencing hearings need not be a battle of the experts." *Majors*, 940 N.W.2d at 393. Accordingly, we held in *Majors* that a juvenile offender's "defense counsel had no duty to present an expert to testify regarding the *Miller/Lyle/Roby* factors." *Id.* We reiterated "that the question of whether or not to call an expert witness is a matter of trial strategy." *Id.* at 392 (quoting *Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988)). We also remarked that "[c]alling a defense expert would run the risk that the prosecutor's cross-examination would elicit adverse information." *Id.* In another recent case, we upheld a twenty-year minimum sentence for a juvenile offender even after the defendant—not the state—called an expert at sentencing. *Goodwin*, 936 N.W.2d at 648. Ultimately, nothing in the Iowa Constitution or our precedents supports Miller's claim that expert testimony is required before a juvenile offender can receive a minimum sentence.

Though "juveniles may be more prone to reform and rehabilitation because of their age and the attendant characteristics of youth, they must also understand the severity of their actions." *Harrison*, 914 N.W.2d at 202 (quoting *State v. Propps*, 897 N.W.2d 91, 102 (Iowa 2017)). The harm to Graber and her family is no less because Miller committed the crime as a juvenile. Youth is a mitigating factor, not an excuse. And as the Supreme Court has declared, "[J]udges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age." *J.D.B. v. North Carolina*, 564 U.S. 261, 279–80 (2011).

In summary, "[c]riminal sentencing may be many things, but it isn't science." *State v. White*, 903 N.W.2d 331, 336 (Iowa 2017) (Mansfield, J., dissenting).

> We can look at a brain scan of a broad cross-section of adolescents and compare that with a brain scan of a broad cross-section of

adults and see significant differences that might well justify substantial legal distinctions. But we neither know, nor even could know, where a particular adolescent is on the developmental curve.

*Id.* at 337 (quoting Paul S. Davies & Peter A. Alces, *Neuroscience Changes More Than You Can Think*, 2017 U. Ill. J.L. Tech. & Pol'y, 141, 155). The Supreme Court has also remarked on the difficulties "even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573. Given these uncertainties about an expert's ability to reach these conclusions, we reject Miller's argument that our constitution mandates such opinions before imposing a minimum sentence.

Overall, the juvenile sentencing factors a district court must consider are less a matter of science and more accurately "tools for weighing juvenile culpability." *White*, 903 N.W.2d at 337 (Mansfield, J., dissenting). The goal of juvenile sentencing hearings "is to craft a 'punishment that serves the best interests of the child and of society,'" and requiring "an expert in every juvenile sentencing case would not serve that goal." *Majors*, 940 N.W.2d at 393 (quoting *Roby*, 897 N.W.2d at 144). This goal is already accomplished when a district court properly considers the *Miller/Lyle/Roby* factors and the twenty-two statutory factors provided in Iowa Code section 902.1(2)(*b*)(2)(a)–(v) (2021) that speak to whether a juvenile offender is irreparably corrupt.

Notably, this process also gives all parties involved an opportunity to present information—including expert testimony—to use in addition to its consideration of these factors. This means Miller had the opportunity to present his own expert testimony if he thought it was beneficial, but it does not mean expert testimony is required. And it certainly does not mean the State had the burden of presenting expert testimony to establish that Miller deserved to serve

a minimum term of incarceration. Consequently, we hold that sentencing juvenile offenders to a minimum term of incarceration before parole eligibility without expert testimony is constitutional under the Iowa Constitution so long as the juvenile receives an individualized sentencing.

**D. The District Court Did Not Abuse Its Sentencing Discretion.** Miller contends the district court abused its discretion by sentencing him to a thirty-five-year minimum term of incarceration before parole eligibility for two reasons. First, he claims the district court unlawfully presumed that it should order a minimum term. Second, Miller argues that the district court misapplied the juvenile sentencing factors in an aggravating fashion.[6] We disagree.

1. *The district court did not apply an improper presumption.* As we explained above, "there is a presumption against minimum terms of incarceration for juvenile offenders," and we will only affirm a minimum term "if the court concludes that sentence is warranted after consideration of the factors." *Majors*, 940 N.W.2d at 387. Miller points to the following statements from the district court in arguing that it had a presumption in favor of a minimum term instead of a presumption against it:

- "I think you're very fortunate, Mr. Miller, that the State of Iowa does not allow the option of life without the possibility of parole, because that would have been a serious consideration for me if I had that option."

- "This is far from a normal case. And to the extent the mandatory minimum is an issue, I think the facts and

---

[6]Miller also makes the vague claim that the district court "shifted the burden to convince the court [that a minimum term was not warranted] to Miller." But other than the challenged statements we discuss in this section, he offers no further explanation of this claim. "[W]e will not speculate on the arguments [Miller] might have made and then search for legal authority and comb the record for facts to support such arguments." *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996).

circumstances of this case demand it and I would not be doing my job if I didn't impose some sort of mandatory minimum."

- "The definition of malice is the intention or the desire to do evil, and evil does not have a birthday. This Court cannot overrule precedent. However, I will not gloss over the fact that you and Mr. Goodale cut Nohema Graber's precious life short. That will not be justice, regardless of your age, Mr. Miller."

But a few statements taken in isolation do not tell the whole story.

The timing of these statements and their context matter, as the district court made these challenged statements after it reviewed the PSI and submitted exhibits and heard testimony from the State's witnesses, Miller's allocution statement, and the victim-impact statements. The district court started delivering its sentence by stating that it had considered the sentencing options provided under Iowa law, the statutory factors required under Iowa Code section 902.1(2)(*b*)(2), and the *Miller/Lyle/Roby* factors. It then thoroughly walked through the factors and how they applied. By the time the district court made the challenged statements, it did so as an explanation of why this information rebutted the presumption against a minimum sentence.

The context also supports this conclusion. For instance, when the district court stated, "I would not be doing my job if I didn't impose some sort of mandatory minimum," it was expressing why the presumption did not apply to Miller. Here is the context:

> And there was some discussion about a mandatory minimum. I am going to issue a mandatory minimum on this case. If I gave the Board of Parole the option to release you without a mandatory minimum, it would be contrary to the public safety of the community you would reside in and to the residents of the community you reside in.

> There was some discussion about there being an expert to impose a mandatory minimum. That normally would be a matter for expert testimony. This is far from a normal case. And to the extent the mandatory minimum is an issue, I think the facts and

circumstances of this case demand it, and I would not be doing my job if I didn't impose some sort of mandatory minimum.

Thus, the district court appropriately considered the penological goals of sentencing, Miller's culpability, and the relevant sentencing criteria in explaining why they required a minimum term of incarceration.

Likewise, when the district court told Miller that he was "very fortunate . . . that the State of Iowa does not allow the option of life without the possibility of parole," it was expressing the seriousness of Miller's offense. Similarly, its remarks that "evil does not have a birthday" and that "[t]his Court cannot overrule precedent," were a small part of the district court's larger justification for imposing a minimum sentence. A few lines before these remarks, the district court acknowledged that minimum terms of incarceration for juvenile offenders are only appropriate when the district court concludes they are warranted after consideration of the relevant factors.

The district court then discussed why that was the case here. Here is the context:

> Certainly, a high school junior who formulates a plan -- or a high schooler that formulates a plan with his friend and murders his Spanish teacher is a dangerous person to the community.

> The definition of malice is the intention or the desire to do evil, and evil does not have a birthday. This Court cannot overrule precedent. However, I will not gloss over the fact that you and Mr. Goodale cut Nohema Graber's precious life short. That will not be justice, regardless of your age, Mr. Miller.

> The bedrock of our criminal justice [system] is deterrence and rehabilitation. And, ultimately, while acknowledging your youth and developing brain, I find that your intent and actions were sinister and evil. Those acts resulted in the intentional loss of human life in a brutal fashion. There's no excuse. There is not a systemic societal problem that explains or justifies your actions.

> The Court finds, based on the nature and circumstances of this offense, along with the required 25 factors that I am to consider

in sentencing a juvenile in the state of Iowa for Murder in the First Degree, that the defendant, Willard Nobel Chaiden Miller, should be sentenced to life with the possibility of parole after 35 years.

A review of the district court's statements in full shows that the district court properly applied the law to impose a sentence authorized by statute and supported by the evidence. It is noteworthy what the district court did not say. Namely, it never proclaimed that Miller failed to rebut a presumption in favor of a minimum term. "Judicial discretion imparts the power to act within legal parameters according to the dictates of a judge's own conscience, uncontrolled by the judgment of others." *Formaro*, 638 N.W.2d at 725. The district court acted accordingly, so we cannot say an abuse of discretion occurred based on the statements Miller challenges.

2. *The district court properly applied the sentencing factors.* Miller maintains that the district court inappropriately considered certain juvenile sentencing factors as aggravating instead of mitigating. This argument conflates the five factors we first espoused in *Lyle* with the sentencing factors that the legislature established in Iowa Code section 902.1(2)(*b*)(2)(a)–(v) for juvenile offenders convicted of a class "A" felony. The confusion is understandable given the overlap between the two. *Compare Lyle*, 854 N.W.2d at 404 n.10, *with* Iowa Code § 902.1(2)(*b*)(2)(a)–(v).

In *Zarate*, we reiterated that the use of the *Miller*/*Lyle*/*Roby* factors "must be considered as mitigating factors in the sentencing process." *Zarate*, 908 N.W.2d at 850. Simply put, if there is information in the record that is helpful to mitigate the defendant's sentence in the district court's application of these factors, the district court must use it accordingly. But Iowa Code section 902.1(2) contains additional factors that the district court may consider aggravating, and this is permissible when it "align[s] with our juvenile sentencing jurisprudence

so as not to overwhelm the mitigating factors associated with youth, especially the five factors of youth set forth in *Lyle*." *Zarate*, 908 N.W.2d at 850. That is precisely what the district court did here.

The first *Miller/Lyle/Roby* factor requires the district court to consider "the age of the offender and the features of youthful behavior, such as 'immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477). Based on the district court's statements that Miller was a "bright and intelligent man . . . [who] committed an evil crime," "had [no] issues prior to [committing the offense] complying with the law," and "knew what [he was] doing," Miller contends that the district court "did not correctly view the youthful factors as mitigating because Miller is a minor whose brain is continuing to develop." Again, Miller conflates the *Miller/Lyle/Roby* factors with the factors under Iowa Code section 902.1(2)(*b*)(2)(a)–(v).

The district court's statement, "You knew what you were doing . . . ," was made during its application of Iowa Code section 902.1(2)(*b*)(2)(i), which addresses the defendant's "capacity of the defendant to appreciate the criminality of the conduct." Similarly, its observation that Miller did not have prior issues with the law was a verbatim application of Iowa Code section 902.1(2)(*b*)(2)(j). And its comment that Miller was a "bright and intelligent man" came in its application of Iowa Code section 902.1(2)(*b*)(2)(k)–(l). There was nothing erroneous about this.

The district court subsequently applied the first *Miller/Lyle/Roby* factor properly, declaring, "The features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences . . . is generally a mitigating factor for you, Mr. Miller." It continued, "[Y]ou certainly naively [thought] that

you could avoid legal consequences by being coy or pointing fingers at others. Certainly your failure to appreciate the consequences played a role in your teacher's death." In the district court's view, Miller's actions also showed "impulsivity," prompting the district court "to reduce a small portion of the mandatory minimum time that I'm going to impose or would otherwise impose on a first-degree murder case." Therefore, the district court correctly applied the first factor.

Under the second factor, the district court must consider "the particular 'family and home environment' that surround the youth." *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477). "This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children." *Roby*, 897 N.W.2d at 146. Noting Miller "had a great home life and grew up in a good home," the district court concluded this factor was "neither an aggravating nor a mitigating factor." We upheld a similar application of that factor in *Majors* when "[t]he record support[ed] the district court's determination that the second factor is not mitigating for Majors." 940 N.W.2d at 389. We reach the same conclusion here.

The third factor requires consideration of "the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime." *Lyle*, 854 N.W.2d at 404 n.10. Miller argues that the district court misapplied this factor because it "commented that the offenses committed by Miller were 'heinous,' 'cruel,' and 'painful.' " However, we have previously stated that "[o]ur sentencing courts can and should consider the heinous nature of the crime in evaluating whether to impose a mandatory minimum sentence." *Majors*, 940 N.W.2d at 389 (quoting *Goodwin*, 936 N.W.2d at 647). Moreover, Iowa Code section 902.1(2)(*b*)(2)(h)(iii) requires the district

court to consider the "heinous, brutal, cruel manner of the murder" as one of its additional, aggravating factors. There was nothing in the record helpful to Miller on this factor, and the district court complied with our precedent and the statute.

Under the fourth factor, the district court must consider "the challenges for youthful offenders in navigating through the criminal process." *Lyle*, 854 N.W.2d at 404 n.10. "This factor recognizes that juveniles are typically less capable than adults at navigating the legal process." *Goodwin*, 936 N.W.2d at 647. Like many of the other factors, nothing in the record related to this factor is helpful to mitigate Miller's sentence.

Miller contests the district court's statement that Miller was "zealously represented by experienced and talented attorneys and [was] able to present a very thorough defense," claiming the district court treated this as aggravating. In reality, the district court simply stated, "I do not find this to be a mitigating factor." This determination was within the district court's discretion.

The last factor is "the possibility of rehabilitation and the capacity for change." *Lyle*, 854 N.W.2d at 404 n.10. The district court appropriately concluded it was "mostly" mitigating and made significant findings on the record. It noted that a long period of rehabilitation seemed necessary—in part because Miller had a history of poor behavior while he was in custody. Additionally, it reasoned, "[A]ny individual who would plan and participate in a murder based on an unsatisfactory grade is an individual that will require immense rehabilitation."

Aside from the *Miller/Lyle/Roby* factors, Miller also asserts the district court made an "improper assessment" in concluding that he downplayed his role in the crime and failed to show remorse because "he was likely not mature enough to . . . adequately express his thoughts or his remorse." Miller fails to

mention that the district court found Miller's acceptance of responsibility "to be a mitigating factor" to some extent because Miller's guilty plea "spared the victim's family, witnesses, and the Fairfield community a protracted trial where the details of this brutal act would be recounted." In any event, the district court had to consider Miller's acceptance of responsibility and remorse under Iowa Code section 902.1(2)(*b*)(2)(f)–(g). We have also indicated that this is "highly pertinent to evaluating [an offender's] need for rehabilitation and his likelihood of reoffending." *State v. Knight*, 701 N.W.2d 83, 88 (Iowa 2005); *see also Harrison*, 914 N.W.2d at 204 (noting the juvenile offender "showed no remorse during sentencing for his actions" in affirming his sentence of life imprisonment with immediate parole eligibility for first-degree murder). And nothing in the record suggests the district court's assessment of Miller's remorse or acceptance of responsibility was improper.

When the PSI author asked Miller "how he feels emotionally on a daily basis, [Miller] stated, 'confident and collected.' " At the sentencing hearing, Miller spent significant time talking about himself and his own desire to reenter society. He proclaimed, "I'm planning on getting back out there as soon as I can to make up for the lost time," and hoped that Goodale, too, "gets out as soon as possible." Further, he concluded his allocution statement by pleading "that I'm given a chance. And I don't want to be institutionalized. I don't want to be in so long that I forget about what matters, where I come from, and what I need to do. I look forward to getting through this."

And though he pleaded guilty and accepted responsibility for "the role that [he] played in the murder of Nohema Graber," he consistently maintained that Goodale was the only one to strike Graber with the bat while he acted as lookout despite evidence to the contrary. Miller told the PSI author, "At first, I felt I

couldn't be guilty because I did not actually hit Mrs. Graber. I only touched Mrs. Graber one time with my foot while moving her. In looking back, I see I made the plan, and I brought the bat." At sentencing, he "accept[ed] responsibility for [his] carelessness, for [his] ignorance."

The record fully supports the following observations of the district court:

> With regard to your remorse, you waited until today to show some sort of remorse for the act that you and Mr. Goodale committed. I find that you downplayed your role in this homicide based on your admissions and the Minutes of Testimony and the evidence presented in this sentencing hearing. It's an aggravating factor.

> [You told] [t]he State's witness . . . , a fellow classmate of yours[,] . . . that you caught a body with a baseball bat. While the defendant is remorseful for his current situation, there has been little remorse shown by Mr. Miller for Nohema Graber, her family.

> I think State's Exhibit 131 shows the extent of the premeditation, to "finalize the win" or "secure a victory" when describing the murder of the defendant that you -- the murder that you and the defendant, Jeremy Goodale, committed.

Overall, we cannot say the district court abused its discretion in its assessment of Miller's remorse or acceptance of responsibility, nor can we say it failed to consider a factor, gave significant weight to an improper factor, or arrived at a conclusion against the facts. *See Majors*, 940 N.W.2d at 387 ("An abuse of discretion may exist if the sentencing court fails to consider a factor, gives significant weight to an improper factor, or arrives at a conclusion that is against the facts."). We affirm Miller's sentence of life imprisonment with the possibility of parole after serving thirty-five years.

**IV. Conclusion.**

For the foregoing reasons, we affirm the district court's sentence.

**Affirmed.**